**UNITED STATES, Appellee,**

v.

**Thomas L. PAIGE, Private, U. S. Army, Appellant.**

No. 31,634.

CM 433359.

U. S. Court of Military Appeals.

Oct. 29, 1979.

For Appellant: *Captain Richard E. Schmidt* (argued); *Captain Sammy S. Knight* (on brief); *Colonel Robert B. Clarke; Major Benjamin A. Sims.*

For Appellee: *Captain Dale L. Anderson* (argued); *Colonel Donald W. Hansen, Major John T. Sherwood, Jr., Captain Richard S. Kleager* (on brief); *Colonel Thomas H. Davis; Lieutenant Colonel R. R. Boller; Major Steven M. Werner; Major Michael B. Kennett; Captain Richard A. Kirby; Captain Gary F. Thorne.*

Opinion of the Court

PERRY,* Judge:

The appellant was convicted by a general court-martial of possession of heroin, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a dishonorable discharge, imprisonment for 18 months, total forfeitures of pay and allowances, and reduction in rank to the lowest enlisted grade. The United States Army Court of Military Review has affirmed. We granted review to consider the appellant's contention, *inter alia*, that incriminating evidence discovered and seized from his person was erroneously admitted against him during his trial, in violation of the Fourth Amendment to the Constitution of the United States.[1] We have concluded that, for the reasons that follow, the evidence should have been excluded by the trial judge. We, therefore, reverse.

I

The facts, largely stipulated to by the parties at trial, are not in dispute. On the occasion which led to his arrest and conviction, the appellant and another serviceman, both of whom were assigned to and on active duty with the 8th Infantry Division in Germany, attempted to enter Germany through the Holland-German border at Aachen Autobahn Nord by automobile, at which time a German border official stopped them and requested identification.[2] Both men produced United States military identification cards. The border official gave the cards to one of two United States Army military policemen who were at the border checkpoint on duty but made no request of them. The military policemen ordered the appellant and his companion to remove their personal luggage to a room within the checkpoint station in order that an inspection could be made of their persons and their belongings. The military policemen first conducted a thorough search of the automobile and found nothing of relevance. Once inside the station house, both men were given "pat down" searches for weapons. Neither the appellant nor his traveling companion was found to possess weapons. Thereupon, the police ordered both men to empty their pockets and to produce their wallets and pass authorizations. The appellant and his companion obeyed. The police observed that the appellant's pass authorization was totally handwritten and, therefore, suspected that it was a falsified document.[3] However, no attempt was made to contact officials at the appellant's military unit concerning the validity of the document. Also, one of the policemen allegedly recalled having seen the name "Paige" on a CID report concerning narcotics.[4] However, no warrant or other process directed that the appellant be arrested. Nevertheless, the police informed the appellant and his companion that they were under arrest for "illegal border crossing"[5] and directed them to remove their

---

* Judge Matthew J. Perry took final action in this case prior to his resignation as a judge of this Court pursuant to his appointment and confirmation as a United States District Judge for the District of South Carolina.

1. Because of the decision we reach on this issue, we deem it unnecessary to discuss the remaining contention made by the appellant, that copies of the trial proceedings were not served upon him or his counsel prior to the convening authority's action.

2. It is apparent from the record that no action of the appellant precipitated the stop and that the German police were routinely stopping all persons entering Germany.

3. The pass authorization produced by the appellant was a DA Form 31, utilized by all the services as the official form which, when completed and signed by proper authority, evidences that the person designated thereon has official leave or permission to be absent from his military unit and/or duty assignment. No statute or regulation prescribes the manner in which the form is to be completed or otherwise prohibits it from being handwritten.

4. No other reference to the report appears in the record. The policeman did not purport to state the full name of the individual listed on the report.

5. The Uniform Code of Military Justice contains no offense delineated as "illegal border crossing." The record is silent as to whether such an offense exists under German law. Moreover, the German border officials did not request the appellant's arrest or the arrest of his companion.

clothing and submit to complete searches of their clothing and persons, including body cavities.[6] While the appellant was disrobing as directed, the military policemen seized from him two plastic bags containing what was subsequently confirmed, through chemical analysis, as heroin. The heroin was admitted as evidence during the appellant's trial despite objections by his attorney that it was discovered and seized while he was unlawfully in the custody of the police, without probable cause and without warrant, in violation of the Fourth Amendment to the Constitution of the United States. The military judge held that the heroin was properly discovered and seized by the police during a search of the appellant pursuant and incident to his lawful arrest by the military policemen. The Court of Military Review has sustained that ruling.

## II

We now consider the appellant's contention that discovery of the evidence was made pursuant to his illegal arrest and that the evidence was thus inadmissible as fruit from the poisonous tree.

■ The Fourth Amendment provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." It may not be gainsaid that in this case the Fourth Amendment became involved when United States Army military policemen informed the appellant that he was under arrest for illegal border

crossing and ordered the appellant and his companion to remove their luggage from the automobile into the checkpoint station. For "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning [of the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). *See also United States v. Martinez-Fuerte,* 428 U.S. 543, 556–58, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Moreover, as *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), demonstrates, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16, 88 S.Ct. at 1877.

Under familiar concepts, the Fourth Amendment requires that the seizure be reasonable.[7] And "the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. at 2579. *See also Terry v. Ohio, supra; Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Thus, as the Supreme Court recently stated, "the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse,*

---

**6.** One of the military policemen, Sergeant Broeker, testified during the trial that he and his colleague were "customs inspectors" and that they were empowered to conduct searches of American personnel and to "control the military, DOD civilians and military dependents coming into Germany and going out of the border into the Netherlands and Belgium." Broeker further testified that the assigned duty of United States military policemen at the border crossing was to suppress illegal drugs from being imported from the Netherlands into Germany and to the American forces. He stated that when "to perform a customs inspection is determined by the person performing the cus-

toms inspection . . . what he wants to look into or what he is looking for" and that "they can do what they want to. They can check the car or they can go through the complete inspection."

**7.** *See also Marshall v. Barlow's, Inc.,* 436 U.S. 307, 315, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Terry v. Ohio,* 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Camara v. Municipal Court,* 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

*supra* (footnotes omitted). And where the circumstances preclude the "insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" *Id.* at 1396–97 (footnote omitted). *See Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *United States v. Martinez-Fuerte, supra; Camara v. Municipal Court, supra.*

Thus, in *United States v. Martinez-Fuerte, supra,* the Court upheld a scheme by which the United States Border Patrol required automobiles traveling from Mexico into the United States to stop at a border checkpoint, even though no articulable facts gave rise to a suspicion that the vehicles contained illegal aliens or contraband. The checkpoint operation in that case was unique, however, and recognized by the Court as a necessary means to control the flow of illegal aliens and contraband into the United States. The Court was careful to limit its holding to stops of the nature described in the opinion, which involved stopping the automobile and questioning the occupants concerning their citizenship status, and cautioned that any further detention must be based upon consent or probable cause. In *United States v. Brignoni-Ponce, supra,* border patrol agents patrolling near the Mexican border randomly stopped automobiles to ascertain whether they contained illegal aliens or contraband. The practice was deemed to violate the Fourth Amendment. However, "because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border," *id.* 422 U.S. at 881, 95 S.Ct. at 2580, the Court analogized the roving patrol stop to the on-the-street encounter addressed in *Terry v. Ohio, supra,* and held that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U.S. at 884, 95 S.Ct. at 2582 (footnote omitted). That holding left intact the principle that at this nation's international borders the United States may lawfully search individuals and their possessions when entry is sought to be made into the United States, even absent probable cause to believe that a violation of the laws of the United States is being committed. *See United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 53 L.Ed.2d 612 (1977); *United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *United States v. 37 Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

But that principle applies *at United States borders.* It is predicated upon the ancient right of the United States as a sovereign nation "to protect itself by stopping and examining persons and property" entering our national boundaries. Searches so made "are reasonable [for the simple reason] that they occur at the border." *United States v. Ramsey, supra* at 616; *Carroll v. United States, supra.*

## III

The Government contends that, for a variety of reasons, the search and arrest of the appellant were reasonable and lawful. Initially, it is argued that the military police were properly assisting the German police in conducting the search at the German-Holland border in accordance with the North Atlantic Treaty Organization Status of Forces Agreement (NATO SOFA), as supplemented, under which the United States agreed that German authorities have the right to conduct border searches of United States armed services personnel entering that country; and that since the United States has an affirmative duty under the treaty to insure that members of its armed forces respect German law, the United States is required to conduct inquiries and collect evidence, thereby assisting German authorities in preventing violations of that country's customs laws. But we are

not here concerned with the acknowledged right of the Federal Republic of Germany to enforce its customs laws. Nor do we question the binding nature of NATO SOFA as between the subscribing nations. Indeed, with respect to NATO SOFA and the requirement of conformity to its terms, "[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we most move with the circumspection appropriate when this Court is adjudicating issues inevitably entangled in the conduct of our international relations." *Romero v. International Terminal Operating Company*, 358 U.S. 354, 383, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959). And matters "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) (footnote omitted). Thus, many questions arising in connection with our treaties with other governments have been held to be nonjusticiable. *Holmes v. Laird*, 148 U.S. App.D.C. 187, 459 F.2d 1211 (D.C.Cir.1972), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972). "Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the . . . legislature; but many such questions uniquely demand single-voiced statement of the Government's views." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962) (footnotes omitted).

However, not all disputes touching upon our foreign relations are beyond judicial scrutiny, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Baker v. Carr, supra*, because

"no agreement with a foreign nation can confer power . . . on any . . . branch of Government, which is free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 4 L.Ed.2d 1148 (1957). Indeed, "[t]he prohibitions of the Constitution were designed to apply to all branches of the National Government and they cannot be nullified by the . . . Executive and the Senate combined." *Id.* at 17, 77 S.Ct. at 1230.

■ We have recently reaffirmed that the protections of the Bill of Rights, and specifically those included within the Fourth Amendment are applicable to men and women serving in the military services of the United States unless expressly or by necessary implication they are deemed inapplicable. *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979). These and other protections follow Americans wherever they may be, even beyond the continental United States, when a court holds them accountable for crimes against the United States. *Reid v. Covert, supra.*[8] Thus, when United States Army military policemen detained the appellant and searched his person and belongings, the Fourth Amendment governed their conduct. As the appellant was not entering a United States border, United States police authorities could not arrest him absent the existence of articulable circumstances amounting to probable cause to believe that he had committed or was in the process of committing a crime. *Brown v. Texas*, —— U.S. ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Dunaway v. New York*, —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Delaware v. Prouse, supra; Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Martinez-Fuerte, supra; United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *United States v.*

---

**8.** *See also Balzac v. Puerto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (Due Process of Law); *Downes v. Bidwell*, 182 U.S. 244, 277, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (First Amendment, Prohibition Against Ex Post Facto Laws or Bills of Attainder); *Mitchell v. Harmony* (US), 13 How. 115, 134, 14 L.Ed. 75

(Just Compensation Clause of Fifth Amendment); *Best v. United States*, 184 F.2d 131 (1st Cir. 1950) (Fourth Amendment); *Turney v. United States*, 115 F.Supp. 457, 464, 126 Ct.Cl. 202, 214 (1953) (Compensation Clause of the Fifth Amendment).

*Brignoni-Ponce, supra; Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *Terry v. Ohio, supra; United States v. Kinane*, 1 M.J. 309 (C.M.A. 1976).

■ The Government also argues that in this case several articulable facts existed at the time which constituted probable cause to believe that a crime had been or was being committed. First, it is argued that the appellant was nervous, sweating and giving short answers to their questions. But that would, at the most, constitute a neutral fact, not probative of anything of value here. The Government contends that the appellant's pass was in handwritten form, which properly could suggest that the appellant was not lawfully absent from his military unit. But no regulation has been cited to us as prohibiting passes in hand-written form. Indeed, no charge was made at that time or later that the appellant was absent without leave. And when the police arrested the appellant, they informed him that the arrest was for illegal border cross-ing. The form in which the pass was writ-ten was not an articulable circumstance which constituted probable cause to believe that the appellant was absent without leave from his military unit. The Government points out the fact that the appellant's com-panion could not at first produce a pass. But that fact would not support the *appel-lant's* detention and search. Finally, the Government argues that one of the border guards remarked that the name "Paige" had previously been mentioned in his pres-ence as a possible dealer in narcotics. But there is no support in the record for any assumption that this appellant is the person described in that conversation. No warrant or order of arrest directed that the appel-lant be arrested. No charges against the appellant had been made. Nor do the above circumstances in combination support the action taken by the police. As the Supreme Court only recently reminded us, "[t]o insist upon neither an appropriate fac-tual basis for suspicion directed at a partic-ular automobile nor upon some other sub-stantial and objective standard or rule to govern the exercise of discretion 'would in-vite intrusions upon constitutionally guar-anteed rights based on nothing more sub-stantial than inarticulate hunches . . .' " *Delaware v. Prouse, supra,* 440 U.S. at 661, 99 S.Ct. at 1400.

### IV

We are not unmindful of the right of the Federal Republic of Germany to protect its national interests at its borders and of the United States' responsibility to honor its treaty obligations. In that regard, one might reasonably assume that German law permits detention and searches of persons attempting to enter its borders. But the German police did nothing in furtherance of such a purpose in this case other than stop the automobile and request identification. When the appellant produced his military identification, the German official gave it to the U. S. military policemen but made no request of them concerning any detention, arrest or search of the appellant or of his possessions. We assume that the action of the German police at that time indicates that they perceived no need for further inquiry as far as German interests were concerned.

The action of the military police, thus, was taken by them in their sole discretion under what they perceived to be their duty as "customs inspectors." One of them de-scribed the standards which governed their operations as that of conducting searches of American personnel and to "control the mil-itary, DOD civilians and dependents coming into Germany and going out of the border into the Netherlands and Belgium." He further stated that whether "to perform a customs inspection is determined by the person performing the customs inspection . . . what he wants to look into or what he is looking for" and that "they can do what they want to. They can check the car or they can go through the complete inspection." Thus, it is apparent that the military policemen were operating at the border checkpoint with unfettered discre-tion to do as they wanted.

That is the scheme under which the military police were acting when the appellant was arrested. It is apparent from the record that no articulable or reasonable suspicion existed at the time the appellant was ordered to remove his luggage and possessions to the station house and be searched. Moreover, there is no offense known as "illegal border crossing," identified by the police as the basis upon which the appellant was being arrested and searched. The arrest and search, therefore, violated the Fourth Amendment to the Constitution of the United States. The heroin which was seized from the appellant's person was, therefore, unlawfully seized and was inadmissible as evidence during the appellant's trial. *Dunaway v. New York, supra; Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Kinane, supra.*

For the reasons stated above, the decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside and the charge is dismissed.

Chief Judge FLETCHER concurs.

COOK, Judge (dissenting):

The parties stipulated at trial as follows: On 1 January 1975, the accused, Private Thomas L. Paige and another individual were attempting to enter Germany in an automobile at Aachen Autobahn Nord, when one of the German border officials pulled them over and asked for their identification cards. The border official gave the ID cards to SSG Bernhard M. C. Broker [sic] and SP4 Thomas M. Raser, 42d M.P. Group (Customs). SSG Broker and SP4 Raser identified themselves. They did not suspect the accused and his companion of committing any offense, however, under what they believed to be their authority to perform border customs searches they ordered the two to get their personal baggage and go inside a designated room to undergo what SSG Broker characterizes as a customs inspection of their belongings and their person.

They were given a "pat down" search for weapons and then were ordered to empty their pockets and produce their wallets and travel documents. SSG Broker noticed that the accused, PVT Paige, was especially nervous during the "pat down" search. Examination of PVT Paige's DA Form 31 revealed that it was totally handwritten and SSG Broker suspected it to be falsified. There is no regulation prohibiting DA Forms 31 from being handwritten, and no attempt was made to contact PVT Paige's commander concerning the validity of the DA 31. SSG Broker also noticed that the expiration date on Paige's ID card appeared to be altered from 1975 to read 1978. At this time SSG Broker remembered the name "Paige" from a CID report to the effect that Paige was suspected of being a dealer in drugs. SSG Broker informed the individuals that they were under apprehension for illegal border crossing. SSG Broker instructed both individuals to remove their clothes in order to conduct a strip search. While Paige was removing his clothes, SSG Broker observed Paige taking an object from his pubic area and attempting to hide it under his coat. SSG Broker immediately seized the object out of Paige's right hand which revealed two small plastic bags containing suspected heroin.

PVT Paige was properly advised of his rights under Article 31b and the *Miranda/Tempia Cases*. He waived the rights by signing the waiver portion of DA Form 3881 (Rights Warning Procedure/Waiver Certificate). Private Paige then made an oral statement to SSG Broker that the substance was in fact heroin which he purchased for $1000.00 from an unidentified Dutchman in Amsterdam. The substance was analyzed by the CID Crime Laboratory and was found to contain 26 grams of heroin.

In addition to the stipulation, Staff Sergeant Broeker testified that prior to declaration of his intention to conduct the strip search, the appellant appeared to be "[e]xtremely nervous," was "sweating," and gave "short answers" to various questions.

The United States and the Federal Republic of Germany have agreed as follows concerning their obligations to police a border-crossing point:

The German authorities and the authorities of a force shall agree on frontier crossing points at which liaison officials of the sending State are to be stationed. These officials shall assist the German authorities in their control functions in order to ensure the speedy and unobstructed passage of the force, the civilian component, their members and dependents, and their accompanying baggage, and of consignments of goods and materials shipped by the force or on its behalf or for its account for the use of the force or of the civilian component, their members and dependents.

Article 3, section 6, Supplemental Agreement to NATO SOFA with Respect to Forces Stationed in the Federal Republic of Germany, [1963], 1 UST 531.

Both Staff Sergeant Broeker and Sergeant Raser were performing duties in compliance with the quoted provision. As appellant was tried by a court-martial for a violation of a law of the United States, the admissibility of the evidence in question depends upon United States law. *See United States v. Jordan*, 1 M.J. 334 (C.M.A. 1976); *United States v. DeLeo*, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954). However, I disagree with the majority that the present case does not fall within the border exception to the probable cause requirement. This Court has previously recognized the applicability of the exception for searches conducted in foreign countries. In *United States v. Carson*, 22 U.S.C.M.A. 203, 206, 46 C.M.R. 203, 206 (1973), the Court, while finding the exception inapplicable to the facts involved in the case, cited *United States v. Greene*, 44 C.M.R. 420 (A.C.M.R. 1971), *pet. denied*, 21 U.S.C.M.A. 619, 44 C.M.R. 939 (1971), with approval. *Greene* upheld a "customs-like search" of the baggage of a soldier prior to his departure from Thailand to the United States. *See United States v. Rivera*, 4 M.J. 215 (C.M.A.1978). The majority reject the border exception in the present case because the border of the

United States was not involved. However, the border exception evolved from the recognition that a nation may protect itself and a customs search was both necessary and reasonable when judged in this context. *See United States v. Ramsey*, 431 U.S. 606, 618–19, 97 S.Ct. 1972, 53 L.Ed.2d 612 (1977). These factors are equally applicable to a foreign country. In the absence of an agreement with the United States, the Federal Republic of Germany has absolute authority over the matter. *See Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957). Here the Federal Republic of Germany has granted the United States the right to intercede where personnel and dependents of the United States armed forces are involved. In my opinion, the reasonableness of the search must be judged in the context of the agreement. As the same considerations prevail here as where the border of the United States is involved, I would apply the border exception to the probable cause requirement.

Even though probable cause is not required for a border search, some courts, in judging the reasonableness of its scope, have required that "real suspicion" be demonstrated as a predicate for a strip search. "Real suspicion" has been defined as follows:

"Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation, as it must be to meet the reasonableness standard of the Fourth Amendment.

*United States v. Guadalupe-Garza*, 421 F.2d 876, 879 (9th Cir. 1970). The standard is

apparently more strict where a search of a body cavity is involved. *United States v. Shields*, 453 F.2d 1235 (9th Cir. 1972), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972).

As I conclude that the strip search was predicated on "real suspicion," I need not now decide whether the standard is required for courts-martial. Initially, I note that the evidence was seized from the appellant's hand and it was, therefore, a "strip search," as distinguished from a body cavity search. Staff Sergeant Broeker observed that the appellant's DA Form 31 was completely handwritten. While the majority have stressed that this was not contrary to any regulation, Broeker testified as follows:

> I check a lot of documents and I have found from experience that every handwritten leave form that I have received has either been falsified or made out by the person himself . . . [or] he had somebody else doing it.

His prior experience is a proper factor in evaluating the propriety of his action. Additionally, he observed that appellant's military ID card appeared to have been altered and appellant's behavior prior to the search was abnormal. Finally, he was aware that an individual bearing the same name as appellant had been implicated in the sale of drugs. The nervousness and demeanor of an individual and his prior implication in criminal conduct are also proper factors in evaluating "real suspicion." *United States v. Carter*, 480 F.2d 981 (9th Cir. 1973). In *United States v. Gil de Avila*, 468 F.2d 184, 186–87 (9th Cir. 1972), *cert. denied*, 410 U.S. 958, 93 S.Ct. 1428, 35 L.Ed.2d 692 (1973), the court noted the following in upholding a strip search:

> In our view, the strip search in question was clearly within the definition of "real suspicion" as formulated in *Guadalupe-Garza*. As indicated from *Shields*, evidence relating to the companions of the subject of the strip search can be considered in determining when such a search may be justified. Here, the extreme nervous manifestations of Herminia's three companions as well as the presence of needle marks on the arms of

one of the men coupled with Herminia's uncontrolled expressions of apprehension clearly are facts to be considered in determining the presence of "real suspicion" as to each member of the group including Herminia.

The facts of the present case are similar to those in *Gil de Avila*. While there was no evidence of needle marks, there was evidence of the possible use of altered and forged military documents. In my opinion, the strip search was predicated on "real suspicion," and the evidence was properly admitted into evidence.

We also granted an issue to consider whether the appellant was prejudiced by the failure of the commanding officer to comply with the provision of Article 33, Uniform Code of Military Justice, 10 U.S.C. § 833, which requires that, if the accused is confined and the charges are not forwarded within 8 days, a written report of the reasons for the delay must be submitted to the general court-martial authority. This issue was not raised before the trial court. Indeed, the trial defense counsel specifically acknowledged that any delay in the disposition of the charges was the responsibility of the defense. Under the circumstances, I would not address the issue at the appellate level, as it has been waived. *United States v. Sloan*, 22 U.S.C.M.A. 587, 48 C.M.R. 211 (1974).

In another assignment of error, the appellant asserts that he was prejudiced by the failure of the Government to provide him a copy of the authenticated record of trial prior to the convening authority's action. The record was authenticated on May 13, 1975, and a copy was mailed to appellant on May 14. Both the post-trial review and the convening authority's action are dated May 14th. As the present case preceded the effective date of *United States v. Goode*, 1 M.J. 3 (1975), which required service of the post-trial review on defense counsel, appellant could not have been prejudiced in responding to the post-trial review. *See United States v. Cruz-Rijos*, 1 M.J. 429 (C.M.A.1976). Furthermore, there

has been no allegation of deficiencies in the record on appeal. *See* my separate opinion in *United States v. Cruz*, 5 M.J. 286, 289 (C.M.A.1978). In any event, the record was mailed to the appellant one day after it was authenticated and the authorities complied with the requirement of Article 54(c), UCMJ, 10 U.S.C. § 854(c), that:

A copy of the record of the proceedings of each general and special court-martial shall be given to the accused as soon as it is authenticated.

Appellant also asserts that the military judge committed reversible error by accepting a stipulation of fact which was equivalent to a confession. Defense counsel asserted at trial, after being question by the military judge as to the expansiveness of the stipulation, that the appellant was pleading not guilty for the sole purpose of preserving the issue as to the legality of the search. Additionally, the military judge advised the appellant as to the consequences of the stipulation. Thus, in my opinion, the stipulation was properly accepted by the trial judge. *See* my separate opinions in *United States v. Reagan*, 7 M.J. 490, 492 (C.M.A.1979), and *United States v. Bertelson*, 3 M.J. 314, 317 (C.M.A.1977).

Finally, the appellant asserts the maximum imposable punishment was improperly calculated as that provided for a violation of Article 134, rather than Article 92, UCMJ, 10 U.S.C. §§ 934 and 892. This issue has been resolved against the appellant by *United States v. Jackson*, 3 M.J. 101 (C.M.A.1977), which held that the limitation on the maximum punishment set forth in *United States v. Courtney*, 1 M.J. 438 (C.M.A.1976), would be applied prospectively only. Here the appellant was tried before the effective date of *Courtney*.

I would, therefore, affirm the decision of the United States Army Court of Military Review.