UNITED STATES

v.

Airman Basic Mikel D. McCULLOUGH,
FR 510–62–9896, United States
Air Force.

ACM 22809.

U. S. Air Force Court of Military Review.

Sentence Adjudged 18 April 1981.

Decided 24 April 1981.

Appellate Counsel for the Accused: Colonel Larry G. Stephens, Colonel George R. Stevens and Captain Douglas H. Kohrt.

Appellate Counsel for the United States: Colonel James P. Porter and Major Robert T. Mounts.

Before ARROWOOD, MAHONEY and MILLER, Appellate Military Judges.

## DECISION

ARROWOOD, Senior Judge:

The accused questions the legality of a customs search of the compartment of the train in which he was riding as it crossed an international border. We find he had no standing to contest the legality of the search of the common areas in the compartment. We also hold that the Government met its heavy burden to demonstrate that the accused knowingly, intelligently and voluntarily waived his right to a lawyer before making a statement even though he had asked to see a lawyer when he was first advised of that right.

The accused was traveling by train from Holland to Germany. At the border a German customs inspector accompanied by a United States Army military police (MP) customs investigator entered the public compartment in which the accused was riding and checked his identification card and border crossing documentation. The inspector then informed the MP that the accused was an "American Soldat." This, because of his prior association with the inspector, indicated to the MP that the inspector intended for him to proceed with a customs inspection of the accused and his baggage. The MP checked the accused's identification card and border documentation forms, satisfying himself that the accused was a member of the United States military. He then asked the accused to identify his baggage. The accused pointed out a suitcase and several other items in the open luggage storage rack above the seat. The MP searched the accused and the baggage but found nothing illegal. He then proceeded to check the common areas of the compartment to see if anything was concealed. Hidden under the seat in which the accused had been sitting he found a yellow plastic bag that contained the drugs in question and a Marlboro cigarette pack with a US Forces tax exempt label. The cigarette package was the same brand as those which the accused had in his baggage. He then asked the accused to get his baggage and follow him off the train and to the customs office. Once there he apprehended the accused and advised him of his right to remain silent in accordance with Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831, and his right to a lawyer. The accused stated that he wanted a lawyer and made no other statement. After being photographed and fingerprinted, the accused was placed in the German jail where he remained overnight.

The next morning he was brought back to the customs office and seated in the office of the senior MP. There he was to wait for an escort which would return him to his unit. While waiting, he noticed the fingerprints and the paperwork on the MP's desk and asked what was going to be done with the fingerprints. Upon being told that they were to be forwarded to the laboratory along with the other evidence for comparative analysis, he remarked, "Well, if that's the case, then you've got me, so I might as well tell you about it." At that time he was told by the senior MP not to say anything further. He then read the accused his rights from DA Form 3881 and asked if he understood them. He responded that he did. Accused was asked if he wanted a lawyer at that time and answered that he did not. He was asked if he wanted to discuss the offenses, and he replied, "Yes." He then signed six copies of the advice form, indicating that he waived both his right to remain silent and his right to a lawyer. The MP then began by telling the

accused to "just start from the Friday before that, when you left Bitburg and, tell me exactly what happened over the weekend." The questions and answers were then reduced to writing, signed and sworn to by the accused.

The previous night when he had ordered the accused be placed in the German jail, the senior MP had been informed that the accused had chosen not to waive his rights. This was the reason he gave for not questioning the accused when he was brought to his office. He had contacted the accused's unit, but had not made definite arrangements for the accused to be picked up. Normally pick-ups were made around noon, the day after the individual was apprehended. Neither the MP nor his subordinate had taken any action to provide the accused with a lawyer, as the accused had requested when first advised of his rights.

■ In his first assignment of error the accused questions the legality of the search in which the drugs he is charged with possessing were discovered. It is well recognized that to contest the legality of a search, a person must have standing; that is, he must be the individual whose own substantive Fourth Amendment rights have been violated by an illegal search. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In effect the individual must have an expectation of privacy from governmental intrusion before he has standing to contest a search. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Standing may be shown from legitimate presence at the scene of the search or ownership of, or possessory interest in, the place or thing to be searched. *United States v. Harris*, 5 M.J. 44 (C.M.A.1978);[1] *United States v. Boyce*, 3 M.J. 711 (A.F.C.M.R.1977).

In *United States v. Simmons*, 22 U.S.C. M.A. 228, 46 C.M.R. 288 (1973), the Court of Military Appeals held that a passenger in a military jeep had no standing to object to the search of the jeep where heroin was found in an attached gasoline can. One judge based lack of standing on the fact that the jeep was wrongfully appropriated, another that it was military property and the third found a lack of standing because the accused had no expectation of privacy in the gasoline can.

In *United States v. Dingwell*, 1 M.J. 594 (A.C.M.R.1975), the Army Court of Military Review found an expectation of privacy in a shaving kit brought on board a military aircraft and kept in that portion of the aircraft commonly used for such purposes. However, they found the accused had no legal standing to contest the legality of the search to those portions of the aircraft as to which he had no expectation of privacy.

■ In applying the law to the facts in this case, we note that the plastic bag containing the contraband drugs had been illegally placed on the train and carried across the border. The bag had not been placed in that portion of the passenger's compartment set aside for the storage of personal items and baggage. The accused, when asked to identify his property, did not disclose the bag. While the accused's ticket permitted him to use the public conveyance in accordance with accepted standards, it did not permit illegal use or authorize him an expectation of privacy in areas which were not designed or intended for passengers or baggage. A passenger using public transportation, such as a train, has no right of privacy which would give him standing to contest a search of the train. Under these circumstances he would only have an expectation of privacy as to items on his person and with respect to his baggage. Therefore, we find, as did the trial judge, that the accused had no standing to contest the lawfulness of the search of the common area of the compartment where the drugs

---

**1.** The automatic standing rule for possession offenses established in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 755, 4 L.Ed.2d 697 (1960); which was followed in *United States v. Harris*, 5 M.J. 44 (C.M.A.1978), has been over-

ruled in *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed. 619 (1980), accordingly, we see no reason to apply that portion of the *Harris* decision relating to automatic standing to this case.

were found.[2]  Accordingly, it was not error for the trial judge to admit the drugs into evidence.

The appellate defense counsel also assert that the statement made by the accused was made involuntarily since he had not been provided with a lawyer as he had originally requested.

■ When an accused, during the course of an investigation requests a lawyer, the interrogation must stop until he is provided a lawyer. While the authorities may decide not to provide a lawyer, they must scrupulously honor his rights and may not question him. If further interrogation is held without counsel and a statement is obtained, a heavy burden rests upon the Government to demonstrate the accused knowingly, intelligently and voluntarily waived this right. *United States v. Muldoon*, 10 M.J. 254 (C.M.A.1981); *United States v. Hill*, 5 M.J. 114 (C.M.A.1978).

In deciding whether there has been such a waiver one should consider the background, experience and conduct of the accused as well as all the circumstances surrounding the making of the statement. Matters to be considered are: whether the accused has an opportunity to consult counsel or was incarcerated; whether subsequent action by authorities was designed to erode the accused's rights; who initiated the contact with the interrogator; the reason for the contact; whether the statement was spontaneous or induced by the authorities; whether there was an express and knowing retraction of the request for a lawyer; and whether there was an express statement of waiver. *See North Carolina v. Butler*, 441 U.S. 360, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Nash v. Estelle*, 560 F.2d 652 (5th Cir. 1977), *rehearing en banc*, 597 F.2d 513 (5th Cir. 1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).

■ Relating the facts of this case to the standard required for a waiver of the right, we note that, when the accused asked for a lawyer, the interrogation stopped. Obviously the accused understood his rights and found that his interrogator fully honored his choice. Although he was placed in a German jail overnight, he was removed from the jail the next morning and allowed to wait in the office of the United States customs investigator for transportation to his unit. While waiting, he was not questioned by the MP investigator and no attempt was made to obtain any statement from him. On his own, he questioned the use of the fingerprints which had been made the night before. After being told they were for comparative analysis, he uttered words reflecting his culpability in the offenses.[3]

His utterance was spontaneous and without inducement or pressure from the investigators. The utterance alone, without the full statement which followed, was sufficient to connect the accused to the drugs. Before any questions were asked, the MP told the accused to say nothing else, and for a second time the accused was advised of his rights. Then he executed a written waiver both as to his right to remain silent and his right to a lawyer. In this case the Government scrupulously honored the accused's rights and met the heavy burden of showing that he knowingly, intelligently and voluntarily waived his rights. Therefore, the trial judge did not err in ruling the confession was voluntary.

The remaining assignment of error is without merit. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

MAHONEY and MILLER, Judges, concur.

---

**2.** Although it is unnecessary for this decision, we note that the facts in this case are easily distinguishable from those in *United States v. Paige*, 7 M.J. 480 (C.M.A.1979), where the Court of Military Appeals required the United States military police (MP) customs investigator at the German/Dutch border to have probable cause to search the person of the accused.

**3.** We have considered the accused's testimony that the MP investigator indicated to him that fingerprints had been found on the drugs. However, we agree with the findings of fact made by the trial judge that the utterance was spontaneous and that the MP did not indicate they had matched the accused's fingerprints with prints found on the plastic bag.