UNITED STATES, Appellee,

v.

**Mikel D. McCULLOUGH, Airman Basic,
U.S. Air Force, Appellant.**

No. 41,457.
ACM 22809.

U.S. Court of Military Appeals.

Jan. 17, 1983.

For Appellant: *Captain John V. Sullivan* (argued); *Colonel George R. Stevens, Captain Douglas H. Kohrt* (on brief).

For Appellee: *Major George D. Cato* (argued); *Colonel James P. Porter* (on brief); *Colonel Kenneth R. Rengert.*

## OPINION OF THE COURT

EVERETT, Chief Judge:

Contrary to appellant's pleas, a military judge sitting as a general court-martial convicted him of violating Air Force Regulation 30–2 by possessing lysergic acid diethylamide (LSD), in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, and of possessing 33.22 grams of marihuana, in violation of Article 134, UCMJ, 10 U.S.C. § 934. The sentence adjudged was dishonorable discharge, confinement at hard labor for 30 months, and total forfeiture of pay and allowances. The findings and sentence were approved by the convening authority and, in turn, affirmed by the United States Air Force Court of Military Review. 11 M.J. 599 (1981). We granted review on this issue:

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE PROSECUTION EXHIBITS 2 THROUGH 6 SINCE THIS EVIDENCE WAS THE PRODUCT OF AN UNLAWFUL SEARCH AND SEIZURE.

We now hold that the judge's ruling was correct.

### I

Sergeant Daniel J. Parks, an Army military policeman, testified that on September 23, 1979, he had been assigned to a Military Police Field Office at Emmerich, Germany, and "was working with the German Customs officials at the border crossing between Arnhem and Emmerich, Germany, on a train." His duties as a "Military Police Customs Investigator" were "to assist the German Customs Officials with an inspection of US Forces personnel [and] to assist the Customs Officials in an investigation of violations involving military personnel." In these investigations and inspections the Germans were in primary control and, during his training before becoming a customs inspector, he had been informed that he was "only to inspect members of the US Forces,

when they are referred to us by German Customs Officials at borders."

At around 9:30 or 10:00 p.m., Sergeant Parks saw appellant "on the last train, going into Emmerich from Arnhem," when Parks "was working with German Customs Officials at that time, on board that train crossing the border." "There were approximately 7 German Customs Officials working on that one particular train" and Parks was walking behind "Mr. Kriegs, one of the German Customs people," who told him that there was "a US Soldat in that compartment where Airman McCullough was sitting." Kriegs "knew that ... [appellant] was an American soldier" because "he had checked his ID card and his border documentation form." There were about ten compartments in the car in which appellant was sitting and he was in a compartment which had three seats on each side. As Sergeant Parks entered the compartment through a glass door from the aisle, appellant was "in the middle seat on the left-hand side." One other person—a German—was in the compartment and "was sitting on the right-hand side."

Mr. Kriegs referred appellant to Sergeant Parks "[f]or an in-customs inspection," which meant to Parks "that he wanted me to check that person for customs violations." In compliance with Kriegs' request, Parks carried out the inspection. Initially, he advised appellant of his identity and that he "was assisting German Customs on a customs inspection." Then Sergeant Parks "asked him to produce his ID card and his border documentation form"; appellant complied. After examining McCullough's documentation, Sergeant Parks "asked him if he had anything to declare" and received a negative response. "Then I asked him to identify his baggage" and appellant "identified one suitcase and a couple of other things; I don't recall exactly what all his baggage was." Sergeant Parks searched the suitcase, which was located above appellant in an open storage rack. However, nothing of an illegal nature was revealed, the contents of the suitcase consisting of such things as "[c]lothing and shaving gear" and "a carton of cigarettes.... After

that, I asked him to empty out his pockets for me on the seat. I inspected the contents of his pockets.... Nothing illegal was found."

"Then I asked him to move to the side, and I ran my hand underneath the seat." In doing this, Sergeant Parks "was checking the common areas to see if anything was concealed" there. "I checked under all the seats on his side." The result was:

Underneath the middle seat which he was sitting on, I felt a plastic bag. I pulled the plastic bag from underneath the seat, and stood up and looked inside the bag. And I saw two small plastic bags, containing suspected marihuana, and two small plastic bags containing suspected hashish, and approximately 21 pieces of paper containing what I believed to be LSD, and one pack of Marlboro cigarettes containing a US Forces tax exempt label, and also containing a couple of cigarettes.

Sergeant Parks seized the items which he had discovered under the seat. Subsequently, over defense objection, they were received in evidence at trial to help prove the offenses with which appellant was charged. In overruling the defense objection, the military judge made these findings:

That Sgt Parks was assisting the German Customs Agents and acting under their control and authority and under the authority of United States Air Forces in Europe Regulation 30–15.

That in the accepted method German customs authority designated Airman McCullough for search by the Military Police Customs Agent, Sgt Parks.

That the search of Airman McCullough by Sgt Parks was lawful as a customs search.

That the search of the public area of the compartment and specifically of the area under the seats did not invade or infringe upon an area wherein Airman McCullough had a right or expectation of privacy.

## II

The Court of Military Review upheld the judge's ruling on the ground that appellant lacked the necessary standing to complain about the legality of the search. We fully agree that McCullough did not possess a reasonable expectation of privacy as to the contraband which he had placed under the seat in the compartment. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Furthermore, even if appellant had standing to contest the search and seizure, the trial judge properly ruled that it was lawful as a customs search.

Recently, in *United States v. Alleyne,* 13 M.J. 331 (C.M.A.1982), we explained why persons arriving or leaving a country may be searched at the border by inspectors, even when no probable cause or individualized suspicion exists. The Supreme Court has emphasized:

That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration.

*United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617, 626 (1977), quoted in *United States v. Alleyne, supra* at 333–34. Of course, in the present case we are concerned with a search performed by American military personnel to enforce German customs laws and to uphold the rights of a foreign sovereign, rather than to protect territory under American control or sovereignty. Nonetheless, we do not believe that the search by Sergeant Parks violated the Fourth Amendment.

The basic inquiry is whether the search was reasonable. In that connection, we note that appellant would have had no legitimate objection if the search had been conducted by Mr. Kriegs, the German Customs Inspector. Not only is the "long-standing right of the sovereign" to conduct customs searches and border searches recognized by judicial precedents, but also it is specifically provided for by international agreements to which the United States is a party. Thus, the North Atlantic Treaty Organization (NATO) Status of Forces Agreement (SOFA) provides that American servicemembers assigned overseas [1]

shall be subject to the laws and regulations administered by the customs authorities of the receiving State. In particular the customs authorities of the receiving State shall have the right, under the general conditions laid down by the laws and regulations of the receiving State, to search members of a force or civilian component and their dependents and to examine their luggage and vehicles, and to seize articles pursuant to such laws and regulations.

Indeed, in the same agreement, the United States even has committed its military authorities to "render all assistance within their power" in enforcing the customs laws of the receiving State.[2]

However, rather than requiring that American military personnel be searched by German customs inspectors—who might have difficulty in communicating with the Americans due to language differences—the Federal Republic has agreed that Americans may act as "liaison officials" to make these inspections. Thus, the Supplementa-

---

1.  Article XI, para. 1, 4 U.S.T. 1792, 1812, T.I.A.S. No. 2846, June 19, 1951.

2.  Article XIII, paras. 1 and 2, *supra* at 1816, which provide:

    1. In order to prevent offences against customs and fiscal laws and regulations, the authorities of the receiving and of the sending States shall assist each other in the conduct of enquiries and the collection of evidence.

    2. The authorities of a force shall render all assistance within their power to ensure that articles liable to seizure by, or on behalf of, the customs or fiscal authorities of the receiving State are handed to those authorities.

ry agreement to the NATO SOFA provides: [3]

The German authorities and the authorities of a force shall agree on frontier crossing points at which liaison officials of the sending State are to be stationed. These officials shall assist the German authorities in their control functions in order to ensure the speedy and unobstructed passage of the force, the civilian component, their members and dependents, and their accompanying baggage, and of consignments of goods and materials shipped by the force or on its behalf or for its account for the use of the force or of the civilian component, their members and dependents.

Elsewhere, the United States and the Federal Republic have provided in more detail for the role of American "liaison officials" in assisting with the enforcement of German customs laws as to American servicemembers entering West Germany. *See* Agreement on the Implementation of the Customs and Consumer Tax Provisions of the Supplementary Agreement to the NATO Status of Forces Agreement in favor of members of a force, of a civilian component and dependents (Article 66 and paragraph 6 of Article 3 of the Supplementary Agreement). Paragraph VII.1 of this agreement provides that an International Crossing Points

(i) The liaison personnel provided for under paragraph 6 of Article 3 of the Supplementary Agreement to assist the German customs officials in their controls may be stationed at such crossing points as are used by a considerable number of members or used to a considerable extent for traffic in goods for the force. The number of persons shall be deemed "considerable" if, on an average, the number of persons crossing the point in either direction together totals 100 members of the force con-

cerned per day. In the case of crossing points used by a considerable number of members only on certain days (e.g., weekends), liaison personnel may be attached on the days concerned.

(ii) Crossing points at which liaison personnel are to be stationed as provided for in accordance with item (i) above shall be determined by agreement with the force concerned. If, owing to changes in traffic the conditions referred to under item (i) above regarding the stationing of liaison personnel no longer exist, such personnel shall be withdrawn by mutual agreement from the crossing points concerned.

(iii) The provisions under items (i) and (ii) above do not exclude the stationing of liaison personnel at inland places for certain sectors of the crossing points.

As for Airfields, it is agreed in paragraph VII.2:

(a) Customs control on military airfields of the force shall be carried out regularly by personnel of the force itself. Subject to that, customs control shall be governed *mutatis mutandis* by the provisions of paragraph 1 of Section II C of the Agreement on the Implementation of Article 65 and Article 67 of the Supplementary Agreement.

(b) Customs control on airfields of the German Armed Forces or on civil airfields shall be carried out by personnel of the German Armed Forces or by German customs officials in accordance with the principles set forth in paragraphs 2 and 3 of Section IVC of the Agreement referred to in subparagraph (a) above.

(c) Under the circumstances referred to in paragraph 1 of Section VII above,

---

**3.** Article 3, para. 6, The Supplementary agreement to the NATO Status of Forces Agreement with respect to forces stationed in the Federal Republic of Germany, 14 U.S.T. 531, T.I.A.S. No. 5351 (July 1, 1963). The same agreement directs that American military authorities "shall co-operate closely with the German authorities in the prevention of customs and tax offences." Article 74, para. 2.

liaison personnel may be stationed at customs airfields to assist the German customs officials in their controls.

The undertaking by the United States of the obligation to assist in the enforcement of German customs laws was quite reasonable. For one thing, the Federal Republic in the proper exercise of its sovereignty might otherwise have refused to allow American armed forces to be stationed within its territory. Secondly, for American "liaison officials" to conduct customs searches facilitates the flow of American military personnel in and out of Germany, since it reduces the delay and misunderstandings that sometimes result from language differences. Thirdly, this arrangement benefits the American military personnel who are subjected to customs inspections, since they will be better able to communicate with American "liaison officials" than with German customs inspectors. Moreover, if the "liaison officials" treat them in an inconsiderate or unreasonable manner, the American military personnel are in a much better position to make an effective complaint than if the inspections were conducted by German customs inspectors.

When McCullough crossed the international border from Holland into Germany, he was on notice that a customs search would occur, for the inspection of luggage by customs officials "is an old practice and is intimately associated with excluding illegal articles from the country." *See United States v. 37 Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822, 834 (1971). He can hardly complain that it was unreasonable for the search to be performed by an American military policeman—acting pursuant to international agreements—rather than by a German customs inspector. Moreover, whether conducted by Americans or Germans there was nothing insulting, frightening, or humiliating in being subjected to routine scrutiny by customs inspectors whose authority was plainly visible and who were making similar searches of others. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976).

Mr. Kriegs, the German customs inspector, could have performed the inspection of appellant, just as American customs officials may inspect someone entering the United States. *See United States v. Ramsey* and *United States v. Alleyne,* both *supra.* If Sergeant Parks—or other American "liaison officials"—do not possess the same authority, the present arrangements between the United States and the Federal Republic contain a major loophole, for American military personnel would be allowed to enter Germany without being subject to the type of inspection that is routine at international borders around the world. The Federal Republic could not long tolerate such a situation and would have to insist that all customs inspections of American military personnel be performed personally by German customs inspectors, who would not be subject to the restrictions applicable to "liaison officials." Even at the military airfields under American control, it would become necessary to arrange for German inspections of incoming military personnel. These untoward consequences which would flow from acceptance of appellant's view help persuade us that the search by Sergeant Parks was reasonable and consistent with the Fourth Amendment. *Cf. United States v. Pereira,* 13 M.J. 632 (A.F.C.M.R.1982); *United States v. Pitts,* 12 M.J. 1024 (A.C.M.R.1982).

Appellant relies especially on *United States v. Paige,* 7 M.J. 480 (C.M.A.1979), *reconsideration not granted,* 9 M.J. 254 (C.M.A.1980). Whatever the binding effect of *Paige* as a precedent, *see* 9 M.J. at 254–55 (Memorandum of Everett, C.J.); *United States v. Pereira, supra,* it can be readily distinguished on its facts. Thus, the staff judge advocate pointed out in his review:

First, although the court recognized the right of the Federal Republic of Germany to protect its national interests by conducting searches at its borders, and the corresponding responsibility of the United States to honor its treaty obligations, in *Paige* the German police did nothing in furtherance of such a purpose other than stop the automobile driven by the appel-

lant and request identification. The military police searched the appellant's car, person, and belongings in their sole discretion under what they perceived to be their duty as "customs inspections." In the present case, however, the German customs authorities actually identified the accused as a person to be inspected (RT 16 and 18). Therefore, the German customs authorities evidently perceived a need for identification and customs inspection of the accused as far as German interests were concerned. However, the evidence disclosed no direct order for Parks to conduct as thorough an inspection of the accused and his belongings as he did. Second, in *Paige,* when the appellant was requested to produce his pass authorization, the military police suspected that it was a falsified document since it was totally handwritten. The appellant and his companion were arrested for "illegal border crossing," and a search conducted incident to the arrest revealed two plastic bags containing what was subsequently confirmed, through chemical analysis, as heroin. In the present case, the contraband was discovered during routine customs inspection (RT 14 and 18–20) and not incident to an arrest.

### III

We conclude that the search performed by Sergeant Parks was lawful as a customs search and that appellant had no reasonable expectation of privacy with respect to the "common area" of the train compartment that was searched. Accordingly, the decision of the United States Air Force Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (concurring):

I concur. In my opinion, however, there is no need to decide this case in light of the decisions of this Court in *United States v. Alleyne,* 13 M.J. 331 (C.M.A.1982), and *United States v. Paige,* 7 M.J. 480 (C.M.A.1979). This is simply a case where appellant had no "standing" by reason of the Fourth Amendment to challenge the admissibility of the seized evidence. *See United States v. Miller,* 13 M.J. 75, 78 (C.M.A.1982); *United States v. Cordero,* 11 M.J. 210, 213 n. 2 (C.M.A.1981).

Admittedly, this case was tried before the two decisions of the Supreme Court which expressly abandoned the automatic standing rule of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *See United States v. Harris,* 5 M.J. 44 (C.M.A. 1978). Yet, unlike the situation presented in *United States v. Salvucci,* 448 U.S. 83, 95, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980), the record of trial in appellant's case is more than adequate to determine whether appellant had a reasonable expectation of privacy in the searched areas and containers. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). This record indicates that the challenged search occurred on board a train in a public compartment in the area beneath appellant's seat. Appellant did not assert his ownership or possession of the seized plastic bag. He had no reasonable expectation of privacy in the searched area of the train (*see Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)) or the seized container (*see United States v. Sanford,* 12 M.J. 170, 174–75 (C.M.A.1981)).