UNITED STATES, Appellee,

v.

Julio E. RIVERA, Airman First Class, U. S. Air Force, Appellant.

No. 30,976.

ACM 21819.

U. S. Court of Military Appeals.

Feb. 20, 1978.

*Major Bruce R. Houston,* argued the cause for Appellant, Accused. With him on the brief was *Colonel Jerry E. Conner.*

*Captain Edward F. Rodriguez,* argued the cause for Appellee, United States. With him on the brief were *Colonel Julius C. Ullerich, Jr.,* and *Captain Frederick P. Waite.*

Opinion

FLETCHER, Chief Judge:

The appellant was convicted by a general court-martial of larceny and possession of heroin in violation of Articles 121 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 934, respectively. The findings and sentence to confinement at hard labor for twelve months, forfeitures of $200.00 pay per month for twelve months, and reduction to the lowest enlisted grade were approved by the convening authority and the United States Air Force Court of Military Review. We granted review to determine whether the heroin seized was the product of an unlawful search, and hence inadmissible.[1] Counsel for the appellant argue that the random gate search program utilized at Korat Royal Thai Air Force Base was constitutionally infirm because it was too vague, undefined, and unlimited in scope and application to pass muster under the Fourth Amendment. I have determined, however, that this case, because of the foreign situs, must be resolved under

1. The supplemental issue granted by the Court has been disposed of by our decision in *United States v. Jackson,* 3 M.J. 101 (C.M.A.1977).

the "border search" line of cases from the Supreme Court, and that application of that doctrine leads to the conclusion that the heroin was lawfully seized.[2]

The heroin in question was the product of two separate seizures. On the night of August 31, 1974, the appellant arrived at gate one of the base riding in a civilian (Thai) taxi; the gate guard, at the direction of a Sergeant Blackmore, the handler for the marihuana detection dog stationed at the gate, directed the taxi driver to pull over to the side of the road and stop. The occupants were removed, and Sergeant Blackmore led the dog into the vehicle whereupon it "alerted" towards the back seat. The dog was led into the back seat area and it "alerted" even more strongly where the appellant had been sitting. Sergeant Blackmore then asked the two passengers for their military identification cards. The appellant, whose hands and legs were visibly shaking, was placed under apprehension after the dog "alerted" upon him, and taken to the gate guard shack and read his rights. A search of his pants pocket revealed a small plastic vial containing the heroin which was the basis for the first charge of possession of heroin.

On October 22, 1974, the appellant and another serviceman were entering the base through gate number one; at Sergeant Blackmore's direction the civilian taxi was stopped and ordered to pull over to the side of the road. As the passengers alighted from the taxi, the marihuana dog "alerted" on the other serviceman; Sergeant Blackmore then proceeded to search the car. When the sergeant noticed the appellant,[3] he took the dog out of the car and asked both the appellant and the other serviceman for their military identification cards. After the dog "alerted" on both men, Sergeant Blackmore informed both that they were being detained. At that point the appellant started to move behind the other passenger and appeared to Sergeant Blackmore to be attempting to place a white container in his mouth. After a struggle, the sergeant was able to force the appellant to spit out the pieces of the container, analysis of which revealed heroin which was the basis for the second possession charge.

I start with the proposition recently reaffirmed by the Supreme Court in *United States v. Ramsey*, 431 U.S. 606, 616–8, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), that searches made at the border,[4] pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into the country, are reasonable simply because they occur at the border.[5] This exception to the

---

**2.** Our decision, therefore, will be concerned with, and limited to, searches occurring at entry point onto American military installations/enclaves from foreign soil. We further limit our inquiry, and the holding of this case, to those procedures which permit an external search of the suspect and his clothing as well as the vehicle and its contents.

**3.** I find nothing, however, in the record to indicate that the sergeant adopted a different procedure upon recognizing the appellant; instead, he continued to search in accordance with the standard procedures.

**4.** As defined in footnote 2, the border search line of decisions beginning with *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), and culminating with *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), are not applicable, as these concerned searches and stops outside the scope of the doctrine discussed in this text. *See also United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574,

45 L.Ed.2d 607, (1975); *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

I am not unaware of the criticism leveled at these opinions. *See e. g. Border Searches: An Exception to Probable Cause*, 3 St.Mary's L.J. 87 (1971); *Roving Border Searches for Illegal Aliens: Avoiding the Exclusionary Rule*, 59 Marq.L.Rev. 856 (1976); *Alien Checkpoints and the Troublesome Tetralogy: United States v. Martinez-Fuerte*, 14 San Diego L.Rev. 257 (1976); *Area Search Warrants in Border Zones: Almeida-Sanchez and Camara*, 84 Yale L.J. 355 (1974). However, I must reserve judgment on the questions posed by those decisions and the commentators until the proper case. I only note that it is most unlikely that the services will be conducting roving or fixed checkpoint stops and searches in foreign countries.

**5.** I must stress that the term "border" is defined as set forth in footnote 2. I note further that the Supreme Court in *United States v. Ramsey*, 431 U.S. 606, 618 n. 13, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), expressly, as do I, re-

search warrant requirement is not based upon the doctrine of exigent circumstances, but instead is the result of historical recognition by both the Congress and the Court of the distinctions between those activities occurring at the border and those occurring elsewhere. The Supreme Court in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), set forth the doctrinal basis for the exception by noting that from the commencement of our government, customs agents have had the power to make searches and seizures without the normal prerequisites of probable cause or a search warrant. The Court emphasized that the very Congress which proposed the Bill of Rights enacted the first customs statute granting such powers to those entrusted with protection of the international borders.[6] The Court has repeatedly[7] embraced the concept that:

> Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.[8]

Clearly the Court in recognizing this exception concluded that Congress had, by enacting the 1789 Act virtually contemporaneously with its proposal of the Bill of Rights, already considered and balanced the conflicting societal interests[9] involved, and that this balancing passed constitutional muster.

I recognize that a distinction between the problem posed by this case and that addressed by the Supreme Court in the *Boyd* line of decisions is the absence of Congressional action granting this custom power to the military as to points of entry onto American installations in foreign countries.[10] Yet, I feel that the essential underlying rationale remains applicable, and that the factual similarities between an international border and the entrance onto an American military installation overseas compels adoption of the border search exception for this situation.

Examining the facts of this case, I am satisfied that the procedures utilized were reasonable and sufficiently non-intrusive to comply with the standards enunciated by the Supreme Court. The magnitude of the service's need—to maintain the security of

served judgment *as to whether the manner and degree of intrusion* which characterized a given set of border search procedures could prove unreasonable and offensive to the Fourth Amendment.

**6.** Act of July 31, 1789, c. 5, 1 Stat. 29, 43, enacted approximately two months prior to the proposal of the Bill of Rights to the state legislatures. Clearly, the tenor of the act, and subsequent legislation, was to permit inspection of the vessel or vehicle entering the country, its contents, and non-intrusive body searches. *See Intrusive Border Searches–Is Judicial Control Desirable?*, 115 U.Pa.L.Rev. 276 (1966).

**7.** *See United States v. Thirty-seven Photographs*, 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *Alexander v. United States*, 362 F.2d 379, 382 (9th Cir. 1966), *cert. denied*, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966); *Landau v. United States Attorney of Southern District of New York*, 82 F.2d 285 (2d Cir. 1936), *cert. denied* 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389 (1936).

**8.** *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). The *Carroll* court, as do I, carefully limited this concept to searches conducted at the border (*see* notes 2

and 4), and recognized that different rules must obtain for the search and seizure of those lawfully within the country. *Id.*

**9.** Criticism of the "balancing analysis" employed by the Court in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), exists. *See e. g., Border Searches and the Fourth Amendment*, 77 Yale L.J. 1007 (1968). Without detailed comment on the merits of that position, I note that *Boyd* continues to be embraced by the Court, and that Congress has continued to adhere to a statutory scheme of customs searches since the 1789 Act.

**10.** I am aware that DOD Regulation 5030.49-R (May 22, 1977), and its predecessor dated February 15, 1973, which set forth in detail under what circumstances military personnel will operate as customs officials, would have been controlling over this case if applicable. These *regulations apply to all services under the De*partment of Defense pursuant to the DOD Directive of September 23, 1971. These are created pursuant to the authority given by Congress in 19 U.S.C. § 1401, and should be considered by this Court in appropriate cases.

the installation on foreign soil and to combat an ever increasing drug traffic problem [11]—when coupled with the reasonableness of the procedures I would authorize [12] persuade me that each search meets the requirements of the Fourth Amendment. The decision of the United States Air Force Court of Military Review is affirmed.

COOK, Judge (concurring in the result):

Although the area involved is a Royal Thai Air Force Base, the part of it occupied by the United States Forces is a "closed" American air base. Without considering possible treaty restrictions, as to which we have not been apprised, in my opinion, the commander of that kind of military installation in a foreign country can, without probable cause or even articulable suspicion, search a foreign registered vehicle driven by a foreign national seeking entry into the base. The fact that the accused was a passenger in that vehicle did not endow him with standing to object to the stopping of it on the two occasions in issue. Consequently, the stopping of the vehicles and the directions to the passenger to dismount did not violate the Fourth Amendment. Those acts, therefore, could not and did not taint what followed; and what followed in each instance constituted, in my view, lawful conduct by Sergeant Blackmore and his dog, and provided probable cause to arrest the accused and search his person as an incident to the arrest. I would, therefore, sustain the trial judge's rulings admitting the results of each search into evidence, and join in the affirmance of the decision of the Court of Military Review.

Judge PERRY concurs in the result.

---

11. We have recently again noted our awareness of this problem in *United States v. Alef*, 3 M.J. 414 (C.M.A.1977). I note further the following testimony of the base commander, Colonel Gallagher, who in addition to commenting on the presence of "heroin addicts on base," and the fact that "police blotters indicate marihuana is discovered about 2 or 3 times a week on the average, and heroin maybe once every two weeks," stated:

> There is a rather severe drug problem, narcotics, and I include marihuana and heroin in that category, the two most prevalent drugs in this area and throughout Thailand. And Korat is certainly no exception. We—it's been estimated that up to eighty percent of our young airmen, E–4 and below, occasionally, at least use marihuana. It's easily and readily obtainable from virtually any samlor driver in downtown Korat at very low prices and we at that time, our command directed and commander directed random urinalysis testing, heroin, did, and we also were on to much marihuana because of the testing.

12. *See* note 5.