UNITED STATES, Appellee,

v.

John A. ALLEYNE, Specialist Four, U. S. Army, Appellant.

No. 40,432.
CM 439423.

U. S. Court of Military Appeals.

July 12, 1982.

For Appellee: *Captain David H. Johnson* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Major Douglas P. Franklin* (on brief); *Captain Kenneth H. Clevenger.*

For Appellant: *Captain Edward J. Walinsky* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Charles A. Byler* (on brief); *Major Raymond C. Ruppert.*

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to his pleas, appellant was convicted by a general court-martial in a bench trial of assault and battery; two specifications of larceny; three specifications of violating a regulation; resisting apprehension; and absence without leave, in violation of Articles 128, 121, 92, 95, and 86 of the Uniform Code of Military Justice, 10 U.S.C. §§ 928, 921, 892, 895, and 886, respectively. He was sentenced to a dishonorable discharge, confinement at hard labor for 2 years and 4 months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The sentence was approved by the convening authority. The Court of Military Review set aside the finding of guilty on one of the specifications of violating a regulation and, upon reassessment, affirmed the sentence except for confinement in excess of 2 years.[1] We granted review on this issue:

THE SEIZURE OF THE WELDING RODS FROM THE APPELLANT WAS THE PRODUCT OF AN ILLEGAL SEARCH.

I

On December 8, 1979, at 10:30 p. m., Alleyne was leaving Camp Carroll, Korea, in a taxi. At that time PFC Edgette, a military policeman, was assigned at Gate 4, through which appellant was departing the post. Edgette testified:

My duties are to check all personnel coming in and going out Camp Carroll, including their baggage and any vehicle they're driving out in, to check their glove compartments, under the seats, any baggage they had, and in their trunks before they leave Camp Carroll. Because the installation commander has put out that all vehicles and persons and baggage that they carry, will be searched before exiting Camp Carroll, except for Generals, Brigadier Generals, and above.

The military policeman also explained that "just before you exit Camp Carroll, and just before entering," there is a sign which advises that "you must present ID's and passes to the MP on the gate before entering or exiting Camp Carroll, and also entry implies consent to be searched."

---

1. The dissenting judge in the court below would also have set aside the finding of guilty on one of the specifications of larceny, since he concluded that the search and seizure which are the subject of our grant were illegal.

Since Edgette, who "had just come on shift," was filling out a report in the gate shack, "PFC Kim, K.Y. my KATUSA partner [2], went out to do the normal routine search of the vehicle and his personal effects before he could exit Camp Carroll." When Kim took "more time than usual" for this purpose, Edgette then checked to "see if there was something I can do to speed up the situation."

Edgette then asked appellant "if there was something wrong, what was the problem"; Alleyne explained that PFC Kim had wanted to see the contents of a "silver canister," which was in appellant's possession. Edgette looked at the top of the canister and after explaining that it contained "just pictures from home," appellant "stuck it back inside of his bag and zipped up his bag."

The military policeman then "informed ... [Alleyne] that it was impossible for ... [him] to ascertain what" was in "the canister just by ... [looking at] the top of it" and he asked that appellant "please open it up and show it to me again." When appellant hesitated, Edgette then requested, "let me at least see the label, if it is yours it will have your name on it." Thereupon, Alleyne pulled the canister "out [of the bag] a little more so that I could read the top part of the label and it had the title of some company in California, but I couldn't read" the label.

According to his testimony, Edgette next said, "if that's yours where is your name, let me see your pass and ID." When appellant told the policeman that "he did not have a pass," he was asked to alight from the taxi. Meanwhile, Alleyne had already stuffed the canister back inside the bag in which he was carrying it and had zipped up that bag. Appellant alighted from the taxi but failed to comply with Edgette's instructions that he go into the gate shack. Moreover, he refused to produce an ID card, as Edgette had requested.

2. Basically PFC Kim was a member of the Korean Army assigned to perform certain

PFC Edgette then telephoned his desk sergeant, Staff Sergeant Bechtal, in order to obtain instructions. Just before doing so he picked up Alleyne's zipper bag to bring it inside the gate shack; in doing so he "noticed how heavy it was." PFC Edgette explained to Bechtal that an "individual is trying to exit the gate with something he doesn't want to reveal in his bag, and he's in civilian clothes, and he wouldn't even show me his ID card [and] he stated he didn't have a pass." Staff Sergeant Bechtal instructed Edgette to "find out what his name is, call up his company, and then if he's okay, let him go." When PFC Edgette reminded the desk sergeant that appellant "has got something in his bag he won't show me," Bechtal advised him to "find out what's inside the bag, do a search." Thereupon, PFC Edgette opened up the zipper bag, removed some clothing, and uncovered several canisters, which contained welding rods. PFC Edgette informed Staff Sergeant Bechtal of these results and "about two minutes later" Bechtal arrived to apprehend Alleyne "for larceny of Government property."

When the welding rods were offered in evidence, the defense objected that they had been obtained by an illegal search. The military judge's overruling of this objection gave rise to the issue now before us.

II

■ When persons or property enter the United States, they may be subjected to searches and seizures that under other circumstances would not be reasonable. Thus, in upholding a customs official's warrantless search of eight bulky envelopes mailed to the Washington, D.C., area from Thailand, the Supreme Court emphasized:

That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they

duties with American troops in Korea.

occur at the border, should, by now, require no extended demonstration. *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617, 626 (1977). *See United States v. Rivera,* 4 M.J. 215, 217 (C.M.A.1978).

In permitting the border patrol to stop vehicles at a fixed check point on the Mexican border so that the occupants could be briefly questioned, the Supreme Court referred to "the substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints." *United States v. Martinez-Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116, 1127 (1976). Furthermore, in connection with such stops at fixed border checkpoints, the Supreme Court noted that the "generating of concern or even fright on the part of lawful travelers—is appreciably less" than for stops made elsewhere, 428 U.S. at 558, 96 S.Ct. at 3083; and that persons being stopped "are not taken by surprise" since "they know . . . the location of the checkpoints." Also, "[t]he location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources." *Id.* at 559, 96 S.Ct. at 3083. Therefore the Court concluded that such "stops and questioning . . . may be made in the absence of any individualized suspicion at reasonably located checkpoints." *Id.* at 562, 96 S.Ct. at 3085 (footnote omitted).

■ In connection with American military installations located overseas, the rationale which supports customs searches and searches at border checkpoints fully upholds the right of military authorities to search persons entering the post through a gate. *See United States v. Rivera, supra.* Although the military installation may not come under American sovereignty and usually is leased from the foreign Government, the distinction between the area within a military post located in a host country overseas and the area located outside that installation is great enough to warrant the same treatment that would apply at an international border. Indeed, that circumstance is recognized by many of the international agreements to which the United States is a party, since these agreements with the host country often provide for different rights and duties onpost than would exist offpost. Therefore, in *United States v. Rivera, supra,* we found in the border-search rationale ample authority for conducting a gate search of someone entering an overseas military installation.

Appellate defense counsel suggest that a distinction should be made between searches made upon entry and those upon exit. However, case law is to the contrary. *See United States v. Swarovski,* 592 F.2d 131 (2d Cir. 1979); *United States v. Stanley,* 545 F.2d 661 (9th Cir. 1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *United States v. Ajlouny,* 629 F.2d 830 (2d Cir. 1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981). *See also California Bankers Ass'n v. Shultz,* 416 U.S. 21, 62–63, 94 S.Ct. 1494, 1517–1518, 39 L.Ed.2d 812 (1974). The Court of Appeals explained in *United States v. Stanley, supra* at 667:

Thus both incoming and outgoing border-crossing searches have several features in common: (1) the government is interested in protecting some interest of United States citizens, such as restriction of illicit international drug trade, (2) there is a likelihood of smuggling attempts at the border, (3) there is difficulty in detecting drug smuggling, (4) the individual is on notice that his privacy may be invaded when he crosses the border, and (5) he will be searched only because of his membership in a morally neutral class.

Although this may be an extension of present law, the similarity of purpose, rationale, and effect between the two types of border searches compels us to hold that the search here was proper.

In this language of its brief in the case at bar, the Government demonstrates that its interest in exit searches is as great as in entry searches:

The Navy Court of Review observed in *United States v. Johnson,* 6 M.J. 681, 684

(N.C.M.R.), *pet. denied,* 6 M.J. 89 (C.M.A. 1978), that the need to safeguard military property is particularly serious with the rise in use of tactical small arms. Obviously, the problem is acute overseas, where there are concentrations of soldiers and hazardous weaponry, both of which must be maintained in a state of readiness. Indeed, with the rise of highly organized and sophisticated international terrorist organizations, host nations would have cause for alarm and outrage should it be determined that the flow of tactical weapons and other military equipment out of a post need not be closely guarded against.

The military is concerned with maintaining readiness and effectiveness. Drugs pose a major obstacle to this objective. In ordering gate searches or inspections, the commander's primary objective is not to apprehend a particular drug offender but rather to deter and cripple the traffic altogether. An entry-exit search program makes it difficult for the wholesaler to bring drugs on post. The exit portion of the program forces the individual drug abuser to buy and use his drugs off post, use the drug on post where the military authorities may observe him, or to carry the drug through the post gateway, where he is subject to discovery.

The military cannot directly control what occurs off post, but the entry-exit search vastly enhances the effectiveness of both property and drug control programs, with minimum impact upon personal liberties.

Additionally, our overseas forces constitute our first line of defense in the event of an armed conflict. There exists a special need to insure combat readiness. Because of the proximity of potentially hostile forces, there also exists the danger that military equipment or classified information may either intentionally or inadvertently fall into the hands of our potential enemies. Preventing the flow of information or military hardware from the installation is as vital a consideration as preventing contraband from entering.

■ We are convinced that nothing in the Constitution requires a distinction between searches made upon entering a military installation overseas and those made upon departing that installation. Indeed, to the extent that domestic searches are authorized at the gates of a military installation,[3] we can perceive no basis for such a distinction in applying the requirements of the Fourth Amendment.

■ We note the observation of the dissenting judge in the court below that Mil.R. Evid. 314(c) seems to limit overseas gate searches to occasions of entry. Since such a distinction would be at odds with the rationale for border searches and with the precedents on the subject—and since the Rule does not purport specifically to preclude the exit search—we are unwilling in this instance to find a negative implication in the authority granted by the Rule to make entry searches.

### III

■ Appellate defense counsel urge that, regardless of the power Army commanders might otherwise have, that Service's regulations have imposed limits on the manner in which searches may be performed at the gates of a military installation. They note that paragraph 2–1*a* of Army Regulation 190–22 provides:

> When the person or property is located in a foreign country, the commander will authorize a search only when such action is authorized by an international agreement or arrangement with the authorities of the foreign country.[4]

Even though an American military installation overseas "is located in a foreign coun-

---

3. *United States v. Harris,* 5 M.J. 44 (C.M.A. 1978), discusses such searches.

4. Mil.R.Evid. 314(c) provides that entry "searches . . . not be conducted at a time or in a manner contrary to an express provision of a treaty or agreement to which the United States is a party." However, under the Rule "[f]ailure to comply with a treaty or agreement . . . does not render a search unlawful within the meaning of rule 311."

try," we doubt that the regulation was intended to apply to a gate search there. Moreover, our international treaties concerning the status of forces usually contemplate that American military authorities may perform searches of servicemembers on an American military installation. However, we need not determine this issue, since we have held that, under similar circumstances, we would not invoke the exclusionary rule even if a treaty violation had occurred. *See United States v. Morris*, 12 M.J. 262 (C.M.A.1982); *United States v. Whiting*, 12 M.J. 253 (C.M.A.1982).

■ Paragraph 2–3a of AR 190–22 authorizes a search of "[p]ersons and their vehicles found upon or leaving restricted areas established pursuant to 50 U.S.C. 797 and AR 380–20, . . . if the search is reasonably necessary to protect national defense material, national defense premises, and national defense utilities from loss, injury, compromise, or destruction." Since 50 U.S.C. § 797 may lack extraterritorial application, the "restricted areas" dealt with in this portion of the regulation probably do not refer to overseas installations. In any event, we conclude that, under the rationale for border searches, an entry or exit search at the gates of an American military installation overseas is "reasonably necessary to protect national defense material, national defense premises, . . . from loss, injury, compromise, or destruction."

■ Paragraph 2–23a of Army Regulation 210–10 directs that "[t]he installation commander will establish rules governing the entry into and exit from the installation, and the search of persons and their possessions." These rules must comply with limitations contained elsewhere in that paragraph; one of those limitations is that even "authorized guard personnel, while in the performance of assigned duty," may search only "when based upon probable cause that an offense has been committed or upon military necessity." Obviously, "military necessity" is an amorphous term, but whatever it means, we are sure that, for reasons already discussed, a gate search of persons and property entering and leaving an overseas military installation is included within its perimeter.

## IV

■ Appellant complains that the military policeman at the gate of Camp Carroll had been allowed great discretion in determining who would be searched. The Supreme Court has made it clear that considerable discretion may properly be allowed to border inspection personnel at a border in determining whom to question or to search, *United States v. Martinez-Fuerte, supra*, and we conclude that similar discretion is available to a policeman assigned at the gate of an overseas American military installation. Moreover, in the present case the military policeman acted with considerable restraint; rather than undertaking a search on his own initiative, he obtained specific instructions from his supervisor, the desk sergeant. Indeed, nothing in the manner of search exceeded the policeman's authority or otherwise made it invalid.[5]

## V

Accordingly, the decision of United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

5. In *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court left open the possibility that "a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out. *Cf. Kremen v. United States*, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 356–358, 51 S.Ct. 153, 157–158, 75 L.Ed. 374 (1931)." 431 U.S. at 618 n.13, 97 S.Ct. at 1979 n.13. In the case at bar, the search by PFC Edgette was not "unreasonable."