UNITED STATES, Appellee,

v.

Steven STRINGER, Private First
Class U.S. Army, Appellant.

No. 67,881.
CMR 9001814.

U.S. Court of Military Appeals.

Argued Jan. 6, 1993.

June 24, 1993.

For Appellant: *Captain Robin N. Swope* (argued); *Colonel Malcolm H. Squires, Jr.,* and *Lieutenant Colonel James H. Weise* (on brief); *Colonel Robert B. Kirby* and *Major Brian D. Bailey.*

For Appellee: *Captain Steven M. Walters* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Major Kenneth T. Grant* (on brief); *Lieutenant Colonel Daniel J. Dell'Orto.*

1. RCM 910(a)(2), Manual for Courts–Martial, United States, 1984.

*Opinion of the Court*

SULLIVAN, Chief Judge:

During June of 1990, appellant was tried by a military judge sitting alone as a special court-martial at Yongsan Military Reservation, Seoul, Korea. In accordance with his conditional pleas of guilty,[1] appellant was found guilty of attempting to violate a lawful general regulation; two specifications of violating a lawful general regulation; resisting apprehension; assaulting a military policeman;[2] and fraudulently using and possessing a military identification card, in violation of Articles 80, 92, 95, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 880, 892, 895, 928, and 934, respectively. He was sentenced to a bad-conduct discharge, confinement and forfeiture of $200.00 pay per month for 4 months, and reduction to the lowest enlisted grade.

On August 10, 1990, pursuant to a pretrial agreement, the convening authority approved only so much of the sentence as provided for a bad-conduct discharge, confinement and forfeiture of $200.00 pay per month for 3 months, and reduction to the lowest enlisted grade. On January 31, 1992, the Court of Military Review affirmed the findings of guilty and the sentence. 34 MJ 667.

We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY FAILING TO SUPPRESS EVIDENCE THE GOVERNMENT OBTAINED THROUGH AN IMPROPER GATE SEARCH.

We hold that the challenged seizures at or near Gate 1, Camp Casey, Korea, were the functional equivalent of a routine border inspection which did not contravene the Fourth Amendment of the U.S. Constitution. *See generally United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Rivera,* 4 MJ 215 (CMA 1978). Moreover, we also hold

2. The decision below and the Answer to the Assignment of Errors erroneously reflect conviction of two specifications of assault on a police officer.

that the evidence produced from these seizures was otherwise admissible under Mil. R.Evid. 314(c), Manual for Courts–Martial, United States, 1984. *See United States v. Alleyne*, 13 MJ 331 (CMA 1982).

The following facts were stipulated to by the Government and appellant at trial. On March 11, 1990, appellant "was approached by a Korean national," Mr. Han, "and solicited to assist in a blackmarketing scheme." Appellant agreed, and Mr. Han subsequently provided appellant with a false identification card, meal card, ration control plate (RCP), letter of authorization (LOA), "and sufficient funds to buy the items desired." Appellant "first proceeded to the Camp Red Cloud class six store and purchased 4 bottles of liquor and transferred them" to Mr. Han. "He then retrieved 8 more bottles of liquor from his room on Camp Indian," Korea, "and transferred these to" Mr. Han.

Appellant then went to Camp Casey, Korea, and bought a refrigerator and washing machine for $1,085.00. These appliances were transported in a Korean truck with a Korean national driver. After having the appliances loaded on the truck at the post exchange warehouse, appellant and his driver "proceeded to Gate 1 at Camp Casey where they planned to exit.... The driver stopped the truck at the guard shack at Gate 1 and" appellant "exited and walked to the pedestrian gate to retrieve the truck driver's license and turn in the pass he had received" upon entering Camp Casey. Appellant "then returned to the truck and gave the driver his license." Next appellant "walked around the front of the truck up to Corporal (CPL) Lee, a military policeman (MP) then on duty." CPL Lee was a Korean Augmentee to the United States Army (KATUSA). CPL Lee asked appellant "what he had in the two large boxes," to which appellant "replied that he had a refrigerator and a washing machine. CPL Lee then asked" appellant for his LOA "and his purchase receipts."

After making "a cursory check of the LOA and receipts," CPL Lee requested appellant "to accompany him to the MP station, 45–50 yards away, so that the desk sergeant could verify the documents. CPL Lee walked to the side" of appellant and sometimes one or two steps behind appellant. CPL Lee had "the LOA and receipts at this time." Inside "the MP station, CPL Lee went up to the desk sergeant's window and handed him the LOA and receipts. The desk sergeant asked" appellant "what unit he was in and the phone number so as to verify the LOA." Appellant answered "with an incorrect unit and failed to give a phone number." When the desk sergeant could not contact the unit, appellant "became nervous and mumbled a garbled excuse. At this time, appellant was asked to produce" his identification card. Appellant "stated it was in the truck. CPL Lee then accompanied" appellant "back to the truck to procure" the identification card. "CPL Lee walked to the side of" appellant "as they proceeded to the truck."

Back at the truck, "CPL Lee moved around to the front of the vehicle where he could look through the windshield" and see appellant "look for" the card. After some delay by appellant, he "turned suddenly towards CPL Lee and forcefully pushed him in the upper chest ..., causing CPL Lee to stumble backwards." Appellant "then ran for the exit gate.... CPL Lee quickly regained his balance and lunged after" appellant "in an attempt to prevent him from running off post. He managed to grab him around the midsection momentarily before" appellant "shook off his grasp and ran out the gate towards the busy intersection immediately outside Gate 1. CPL Lee shouted" for appellant "to stop." After a brief chase, CPL Lee apprehended appellant with the assistance of two American servicemembers. Appellant had resisted the apprehension until CPL Lee placed him in handcuffs.

During the pretrial hearing pursuant to Article 39(a), UCMJ, 10 USC § 839(a), defense counsel moved to suppress the washing machine and refrigerator in appellant's truck; the sworn statements made by appellant after his arrest; and the documents surrendered by appellant, to include the false LOA, identification card, and RCP.

Defense counsel argued that appellant had been unlawfully seized in violation of his Fourth Amendment rights. After hearing testimony and argument, the military judge denied the defense motion and made the following conclusions of law:

> [T]he stopping of the accused as he was exiting Camp Casey by Corporal Lee was lawful and ... taking him a short distance away from Gate 1 to the military police station so that the desk sergeant could take a few minutes to verify the authenticity of the Letter of Authorization prior to the accused's departure from Camp Casey with his purchases was minimally intrusive and was applied by Corporal Lee without discretion to persons departing Camp Casey with high value items that day. These procedures as applied on 11 March 1990 at Gate 1, Camp Casey, were part and parcel of a valid search permitted under Military Rules of Evidence 314(c) of persons exiting Camp Casey. I further conclude such exit search procedures are permissible even though they involve a brief seizure of such persons, and that such brief seizure is reasonable within the meaning of the Fourth Amendment of the United States Constitution.

---

### The Challenged Seizures

Prior to pleading guilty, appellant challenged admission of certain evidence obtained or derived by the prosecution as a result of his confrontation at Gate 1, Camp Casey, Korea, on March 11, 1990. He asserted that this evidence was illegally seized from him by a military gate guard at a military police station near Gate 1. These seizures, he argued, were not part of a valid gate inspection because they were not done at the actual gate and otherwise constituted unreasonable government conduct within the meaning of the Fourth Amendment. *See generally United States v. Phillips*, 30 MJ 1 (CMA 1990). He largely premised the latter contention on the fact that these seizures were not accomplished pursuant to a written order of the installa-

tion commander or accomplished under one which sufficiently limited the discretion of the searching gate guard. He modified his position on appeal to argue that, even if this was a legitimate gate search, its execution under these circumstances violated the Fourth Amendment and Mil.R.Evid. 314(c). Accordingly, appellant now concludes that exclusion of the above evidence was dictated by both the Fourth Amendment exclusionary rule, *see generally Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and Mil.R.Evid. 311(a).

■ As a starting point, we note that appellant was stopped at the gate of a United States military installation in a foreign country. The challenged seizures of his property occurred within 50 yards of the gate as part of the gate-inspection process. This location is unquestionably the functional equivalent of the border for purposes of the Fourth Amendment. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985) (international airport is functional equivalent of border). *Cf. Almeida–Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40 (1973) (roving patrol 25 miles north of border not functional equivalent of border); *United States v. Ortiz*, 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975); *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (checkpoint 66 miles north of border is not functional equivalent of border). Accordingly, we reject appellant's trial argument that these seizures should not be constitutionally viewed as gate searches at the border of a foreign country. *See generally United States v. Alleyne* and *United States v. Rivera*, both *supra*.

We also note that during the suppression hearing the gate guard's military supervisor testified concerning the command policy authorizing the challenged gate seizures. *See United States v. Albertini*, 472 U.S. 675, 690, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985); *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 890–94, 81 S.Ct.

1743, 1746, 6 L.Ed.2d 1230 (1961). The supervisor's testimony was as follows:

Q. Sergeant Harcharik, this incident occurred on March 11th, 1990; at the time what was your job in the 2d MP Company?

A. I was platoon sergeant for Sergeant Lee and I was also performing duties as Military Police Duty Officer.

Q. And at that time how long had you been in the role as platoon sergeant?

A. Approximately 7 months.

Q. *Are you aware or were you aware of a policy, if any, concerning verification of LOAs that existed at Camp Casey at the time of this incident?*

A. *Yes, sir, I was.*

Q. Would you please describe the policy?

A. Okay. It was a policy that'd been passed on verbally by the Provost Marshal's Operations NCOIC, the MPI NCOIC, and it was briefed numerous times at guard mounts prior to taking duty and during some duty days the CID blackmarket team would also come over and they would brief different people on stuff to look for and how to handle it.

Q. *And what was the policy?*

A. *That any high value—LOA items of high dollar value; refrigerators, washers, dryers, floor model type TVs; when individuals attempted to exit through gate 1 that they should be stopped, all the documentation pertaining to the items and their identification should be obtained, they should be taken to the MP desks so the units could be called to verify that the LOA was issued to that individual.*

Q. *Was this policy applied to all military personnel regardless of rank?*

A. *It applied to anyone that had those items in their possession, no matter military or civilian authorized to purchase that.*

Q. And what were the gate guards instructed to do then if someone attempted to exit post with such an item?

A. They were—the vehicles would be stopped, the identification obtained, ration control plate, the receipts, the LOA obtained. They would look at the items. They'd look at the documentation and then they would escort the individual and take the paperwork to the MP station.

Q. And what would happen there?

A. They would give the paperwork to the desk sergeant who would, in turn, call the unit and talk to either the first sergeant or the commander, whoever was authorized to hand LOAs out.

Q. What was the purpose of that call?

A. To verify that that individual had been given the LOA from the unit and was authorized to purchase that item.

Q. Okay. And assuming the verification worked, what occurred next?

A. The desk sergeant would hand the individual back all the documentation that was obtained and tell them to have a nice day and he'd go on his way.

Q. And from your experience as platoon sergeant, what would you estimate the amount of time was that would elapse from when the guard would say stop the vehicle, to going to the MP desk and going through the procedure and then releasing the individual?

A. I would say no more than 5 minutes.

Q. Was this policy administered uniformly or did some guards do it differently? Did some guards just let people go through?

A. The possibility exists that some guards may have just checked the documentation, signed it out and let them through. When my platoon was working they were briefed that the people on the gates would stop and check all those vehicles and they would obtain documentation and take to the PMO.

Q. If one of your gate guards allowed a vehicle to pass through just on its own check was that considered permissible, was that okay?

A. If at the time that they did it, if we found out they did it, we would verbally counsel them and we would inform them that the procedure is you're supposed to obtain all the paperwork, escort the individual to PMO so that phone call can be made to the unit to verify the purchase.

Q. Okay. Going back to the basis of the policy, why would the guards take the individual over to the MP station? What was the purpose of going to the desk sergeant? Don't they have [a] phone right there at the guard shack?

A. There is one phone at the gate, sir. The reason for taking them to the PMO is that it's the desk sergeant's responsibility to call the units. He's an NCO and to have a lower ranking person call a unit, I don't think he'd get the same response.

Q. How experienced are gate guards at Camp Casey? In your opinion are they experienced enough to evaluate these matters on their own?

A. Could you rephrase the question, please?

Q. The gate guards at Camp Casey, are they generally experienced or inexperienced MPs?

A. Yes, sir, they've all been there for quite some time, at least two to three months, and the patrol supervisors and the duty officers go out to the gates periodically and make sure that they know what they're doing.

Q. And would you say that the gate guards are aware of the policy that you've just described to me?

A. I can speak for my people that they were, yes, sir.

Q. And Sergeant Lee was in your platoon at the time of this incident?

A. Yes, sir.

Q. And you're saying that he was aware of the policy?

A. Yes, sir.

(Emphasis added.)

The military judge also made specific findings of fact on the execution of this command policy:

While there was a phone at the Gate 1 guard post, Corporal Lee then escorted the accused to the MP desk sergeant who was located in the MP station some 45 to 50 yards away from Gate 1. This was for the purpose of having the desk sergeant who had telephone listings for all military units to call the accused's unit to verify the authenticity of the Letter of Authorization to purchase high value items. This was consistent with a policy that Corporal Lee had been briefed on by his platoon sergeant that he was to stop vehicles departing Gate 1, obtain Letters of Authorization for high value items purchased on Camp Casey, inspect the items, and take the purchaser to the MP station to have the desk sergeant call the purchaser's unit to verify the authenticity of the Letter of Authorization. *While this unwritten policy has existed for some time, it was not uniformly enforced by members of the 2d MP Company.* When there were not a lot of people in the MP station with Letters of Authorization, this verifying procedure generally took 5 minutes. Corporal Lee also stated that he was only suspicious because of the boxes and indicated that he had never seen a washer and a refrigerator being taken off post before.

(Emphasis added.)

In view of the absence of a particularized objection at trial that this inspection was not authorized by the Commander of Camp Casey, we will consider this issue waived. *See* Mil.R.Evid. 311(d)(2) and 103(a)(1). *See also United States v. Rascon,* 922 F.2d 584, 588 (10th Cir.1990). *See generally* 4 W. LaFave, *Search and Seizure* § 11.1(a) at 188 (2d ed.1987).

I

■ The first question we must therefore address is whether the challenged seizures of appellant's person and property were unreasonable under the Fourth Amendment because they were not accomplished in accordance with a *written* command directive or order. Appellant sug-

gests that gate inspections which are conducted pursuant to oral directives are *per se* unreasonable within the meaning of the Fourth Amendment. Citing no authority, he asserts that "[i]nconsistent application of an unwritten directive not promulgated by the appropriate authority demands a finding of an illegal search." Final Brief at 8.

■ We note that only the Warrant Clause of the Fourth Amendment expressly requires some sort of writing. *See generally Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). However, in *United States v. Stuckey*, 10 MJ 347 (CMA 1981), this Court opined "that a commander's power to authorize searches is independent of the Warrant Clause of the Fourth Amendment." *Id.* at 361. There, we held that a military commander may authorize a search based on information that is not necessarily "supported by Oath or affirmation." Similarly, since the commander's gate-inspection authorization is not a warrant, the Warrant Clause does not require that it be in writing. *See id.* at 360–61; *cf.* Mil.R.Evid. 315(b)(1) (authorization for probable-cause search may be written or oral).

■ In addition, we note that this Court has long recognized a servicemember's Fourth Amendment right to protection against unlawful searches and seizures. *See United States v. Thatcher*, 28 MJ 20 (CMA 1989); *cf. United States v. Lopez*, 35 MJ 35 (CMA 1992). Likewise, we have recognized the military commander's authority to search persons and places within his control. *See United States v. Stuckey, supra. See also Cafeteria Workers v. McElroy, supra.* The constitutional line for admission at courts-martial of evidence produced by such searches and seizures is that such command action must be *reasonable. United States v. Thatcher, supra* at

22. *See generally United States v. Montoya de Hernandez*, 473 U.S. at 537, 105 S.Ct. at 3308.

■ Here, the testimony of the Military Police Duty Officer established that the challenged inspection in this case was conducted near the gate of a United States military installation in a foreign country pursuant to properly authorized command policy. Routine border inspections are generally considered reasonable simply because they are conducted at our nation's borders. *United States v. Ramsey*, 431 U.S. at 616, 97 S.Ct. at 1978. Moreover, while the command authorization in this case was not evidenced by a writing, its purpose, scope, and particulars were shown with sufficient definiteness to permit an assessment of the reasonableness of the inspection's execution. *See United States v. Ramsey, supra* at 618 n.13, 97 S.Ct. at 1979 n.13; *United States v. Rivera*, 4 MJ at 217 n.5. Accordingly, we conclude that the absence of a written command policy did not render this border-inspection scheme unreasonable.[3]

## II

■ The next question we address is whether appellant's seizure was unlawful under Mil.R.Evid. 314(c) because it was not accomplished according to a *written* policy. Mil.R.Evid. 314(c) provides in pertinent part:

[A] commander of a United States *military installation,* enclave, or aircraft *on foreign soil,* or in foreign or international airspace, or a United States vessel in foreign or international waters, *may authorize appropriate personnel to search persons or the property of such persons upon entry to or exit from the installation, enclave, aircraft, or vessel to ensure the security, mili-*

---

**3.** We again note that appellant complains that the fact this unwritten policy was not uniformly applied by gate guards at Camp Casey, Korea, "demands a finding of an illegal search." Final Brief at 8. No legal authority is cited for this argument. Moreover, in view of the testimony of the gate guard's supervisor concerning the

counseling of errant guards, we remain convinced that a routine border search occurred in this case. *Cf. United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310 (1985)("reasonable suspicion" required for detentions beyond scope of "routine customs search and inspection").

tary fitness, or good order and discipline of the command. Such searches may not be conducted at a time or in a manner contrary to an express provision of a treaty or agreement to which the United States is a party. Failure to comply with a treaty or agreement, however, does not render a search unlawful within the meaning of Mil.R.Evid. 311. *A search made for the primary purpose of obtaining evidence for use in a trial by court-martial or other disciplinary proceeding is not authorized by this subdivision.*

(Emphasis added.)

The first sentence of Mil.R.Evid. 314(c) clearly requires exercise of the installation commander's inherent authority to maintain basic discipline, readiness, and effectiveness over military installations on foreign or domestic soil. *See generally Brown v. Glines,* 444 U.S. 348, 356, 100 S.Ct. 594, 600–01, 62 L.Ed.2d 540 (1980) (military commander's duty to maintain "morale, discipline, and readiness" includes authority to restrict activity on military installation); *United States v. Alleyne,* 13 MJ at 334–35 (entry-exit searches address military commander's concern with maintaining readiness and effectiveness). Furthermore, the final sentence establishes the only additional regulatory requirement for admissibility of evidence obtained in a gate search at a military installation on foreign soil. Essentially, the search must *not* be conducted "for the primary purpose of obtaining evidence for use in a trial by court-martial or other disciplinary proceeding." Accordingly, we conclude that Mil.R.Evid. 314(c) on its face does not require written command authorization.

Appellant, nonetheless, argues that Mil.R.Evid. 314(c), as construed by military case law, mandates that "before a search without probable cause can be conducted at a gate there must exist a written rule promulgated by the installation commander." Final Brief at 11. He relies on *United States v. Alleyne, supra,* and *United States v. Jones,* 24 MJ 294 (CMA 1987). We find no merit in this contention.

In *United States v. Alleyne, supra,* this Court was urged by appellate defense counsel to specifically apply the provisions of paragraph 2–23a of Army Regulation 210–10 to a gate search. Paragraph 2–23a required "[t]he installation commander [to] establish rules governing the entry into and exit from the installation, and the search of persons and their possessions." 13 MJ at 336. By contrast, in the case now before us, appellant has not offered this Court any statute, service regulation, order, or standard operating procedure governing gate searches on foreign military installations which specifically requires the installation commander to establish rules, either in writing or orally. Thus, our holding in *United States v. Alleyne, supra,* does not support appellant's position.

Appellant's reliance on *Jones* is equally misplaced. In that case this Court decided an appeal from a military judge's ruling on admissibility of evidence obtained pursuant to a gate search at a domestic military installation. The applicable rule was Mil.R.Evid. 313(b), Manual for Courts–Martial, United States, 1969 (Revised edition). This Court opined that Mil.R.Evid. 313(b) is "reflective of the balance between the responsibility of the commander to secure the safety and welfare of his installation and the rights of persons to be free from unreasonable searches and seizures of their persons and property." 24 MJ at 295.

However, in *Jones,* the installation commander's written memorandum establishing the gate-search policy was considered in determining that its primary purpose was not criminal. *See also* Mil.R.Evid. 314(c), 1984 Manual, *supra.* The written memorandum demonstrated that the disputed search was conducted in furtherance of legitimate command administrative policies and directives. 24 MJ at 296. The opinion does not suggest that a gate-search policy must be in writing to be valid. Optimally, the authority, policy, and procedures for conducting gate searches would be embodied in a document. However, this Court's task is not to set forth the best procedures, but to determine whether the

minimal legal requirements are satisfied. *See United States v. Stuckey,* 10 MJ at 363. Accordingly, our case law does not establish that a gate search conducted pursuant to Mil.R.Evid. 314(c) must be authorized in writing by the base commander.

### III

■ Another constitutional question in this case is whether appellant's seizure was unlawful because the command policy imparted too much discretion to the gate guards to determine whom to stop and inspect. *See Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Here, the gate guards had discretion to stop military personnel leaving the installation based on their judgment that items being transported were of high value. Appellant initially asks this Court to find such an administrative search constitutionally unreasonable because it was not based on probable cause, reasonable suspicion, or some other objective and neutral fact. *Id. See generally Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).

■ The Fourth Amendment balancing test proposed by appellant would require us to weigh the interests or needs of the service and the intrusiveness of the search against the interests or rights of the individual to determine the degree of permissible discretion. *See generally Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). However, border searches and gate searches on foreign military installations, unlike other administrative searches, are presumed reasonable even if the gate guards exercised broad discretion. *United States v. Ramsey,* 431 U.S. at 616–18, 97 S.Ct. at 1978–80, *cited in United States v. Rivera, supra* at 216.; *see also United States v. Montoya de Hernandez,* 473 U.S. at 539–40, 105 S.Ct. at 3309–10, 87 L.Ed.2d 381. The mere fact that appellant was exiting the base in a foreign country made his stop reasonable.

The Supreme Court in *United States v. Ramsey, supra,* said the following on this point:

That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration.

\*        \*        \*

More recently, we noted this long-standing history in *United States v. Thirty-seven Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971):

> "But a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search. Customs officials characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country."

In *United States v. 12 200–Ft. Reels of Film,* 413 U.S. 123, 125, 93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973), we observed: "Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad, comprehensive powers '[t]o regulate Commerce with foreign Nations.' Art. 1, § 8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." ...

Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This

longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself. We reaffirm it now.

431 U.S. at 616, 618–19, 97 S.Ct. at 1978–79, 1979–80 (footnote omitted).

We also note that the manner of this inspection's execution was eminently reasonable. *United States v. Ramsey, supra* at 618 n.13, 97 S.Ct. at 1979. Appellant's detention and inspection occurred at the gate of a United States military installation on foreign soil. *Cf. United States v. Martinez–Fuerte,* 428 U.S. 543, 563, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976). Moreover, Corporal Lee was directed by his military superiors to detain service personnel at Gate 1 on the basis of the relatively neutral fact of the high value of the item being transported. *See United States v. Jones,* 24 MJ at 296. Finally, the brief detention of appellant for inspection and verification of ration control documents was a minimal intrusion upon any residual constitutionally protected interests which appellant might have had in these circumstances. *Id. Cf. United States v. Montoya de Hernandez,* 473 U.S. at 535–36, 105 S.Ct. at 3307–08 (28–hour detention by border police to permit passing of some cocaine-filled balloons from person's alimentary canal).[4] Accordingly, we again hold that the challenged gate search initiated by Corporal Lee at Gate 1, Camp Casey, Korea, was reasonable within the meaning of the Fourth Amendment. *United States v. Ramsey, supra.*

## IV

■ Our final concern is whether appellant's seizure was unlawful under Mil. R.Evid. 314(c) because the command policy provided too much discretion to gate guards to determine whom to stop and question. We find no express prohibition against exercising discretion in this rule. *See United States v. Alleyne, supra; cf. United States v. Flowers,* 26 MJ 463, 465 (CMA 1988) (recognizing that notion exercise of any discretion renders search unreasonable *per se* has been rejected). Moreover, we hold that the limitation on discretion in the Camp Casey gate inspection process precluded any suggestion that the primary non-criminal purpose requirement of Mil.R.Evid. 314(c) was otherwise violated. *See also United States v. Jones, supra.*

Consistent with this Court's decision in *United States v. Alleyne,* 13 MJ at 336 (citing *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)), we have held that "considerable ... discretion is available to a policeman assigned at the gate of an overseas American military installation." 13 MJ at 336. In this case, which is similar to the circumstances in *Alleyne,* Corporal Lee was acting in accordance with specific directions of his supervisor to verify certain LOAs of all persons who carried high value items. This order imposed a "considerable restraint" on Corporal Lee's discretion, *id.* at 336, and significantly reduced the possibility that this search was accomplished for the primary purpose of obtaining criminal evidence. *See United States v. Jones,* 24 MJ at 295–96. Therefore, we hold that the search conducted by Corporal Lee pursuant to this legitimate administrative command policy also did not contravene Mil.R.Evid. 314(c).

---

4. This Court, like the Supreme Court, has reserved the right to review the manner and degree of intrusion of a given set of search procedures. *United States v. Rivera,* 4 MJ 215, 216–17 n.5 (CMA 1978). In exercising our power to review the procedures used by Corporal Lee at Gate 1, we hold that the search was conducted in a reasonable manner and with minimal intrusion, satisfying the requirements of the Fourth Amendment. After initially detaining appellant, Corporal Lee then escorted him some 45-50 yards to the MP station. While in the MP station, the desk sergeant asked appellant for basic information, to include unit of assignment, which would have enabled the desk sergeant to verify appellant's authorization for the items. The military judge found that the procedure normally took about 5 minutes. *Cf. United States v. Alleyne,* 13 MJ 331, 336 (CMA 1982). *See generally United States v. Ramsey,* 431 U.S. 606, 618 n.13, 97 S.Ct. 1972, 1979, n.13 (1977).

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

GIERKE, Judge (concurring):

This is another case in which we must comb through a rambling, unfocused objection to determine if the required "magic words" were inadvertently uttered to avoid waiver. *See generally United States v. Brandell*, 35 MJ 369, 372 (CMA 1992) (defense counsel's "rambling objection" held "sufficient" to preserve hearsay objection). It appears that the bases of the defense objection in this case were (1) the search was not a "gate search" because it took place a short distance from the gate; (2) the search was not based on probable cause; and (3) the gate guards had unfettered discretion in determining who to search and what to search for. I agree with the Chief Judge's disposition of these issues. I have doubts whether command authorization for gate searches was established, but I need not resolve that issue because I join the Chief Judge, Judge Crawford, and Judge Wiss in holding that the issue of command authorization was waived. Mil.R.Evid. 103(a)(1); 311(d)(2)(A) and (3), Manual for Courts–Martial, United States, 1984.

Most of the argument and evidence dealt with the lack of written guidance to limit the discretion of the gate guards in executing the gate-search policy and not with the existence of a gate-search policy itself. To the contrary, defense counsel cited the 2d Infantry Division Supplement to United States Forces Korea Regulation 190–7 in his argument at trial on the motion to suppress. With no defense objection, the military judge granted the prosecution request to take judicial notice of the supplement. The Division Supplement mandates " 'pat down' searches of individuals departing 2d Division Installations," spot checks of packages, inspections of vehicle dispatches, and documentation of "high dollar items" entering and exiting the installations. Both sides premised their briefs and arguments on the existence of the Division Supplement. After argument on the motion, the military judge *sua sponte* questioned whether the Division Supplement was still in effect, and trial counsel responded that it had been automatically "cancelled" when USFK Reg. 190–7 was superseded. No one questioned or discussed whether the administrative "cancellation" of the Division Supplement by the republication of a higher headquarters directive amounted to revocation of the gate-search policy itself. Trial counsel did not state, and the military judge did not ask, whether the "cancelled" supplement had been replaced by another directive. Even in the face of this revelation, defense counsel did not contest the existence of command authorization for gate searches.

In my view, any objection based on lack of command authorization to conduct gate searches was waived. Mil.R.Evid. 103(a); 311(d)(2)(A) and (3). Accordingly, I join in affirming the decision of the United States Army Court of Military Review.

CRAWFORD, Judge (concurring in the result):

I concur with the principal opinion's conclusion that this was a valid gate search under Mil.R.Evid. 314(c), Manual for Courts–Martial, United States, 1984, based on waiver of the requirements for a command authorization because of an "unfocused objection." 37 MJ at 130 (Gierke, J., concurring). *See* Mil.R.Evid. 311(d)(2)(A) and (3). I believe we need not go any further in deciding this case.

WISS, Judge (concurring in the result):

The principal opinion concludes that the place at which appellant was stopped and his property seized was "unquestionably the functional equivalent of the border for purposes of the Fourth Amendment." 37 MJ at 123. I agree. *See United States v. Alleyne*, 13 MJ 331, 333–35 (CMA 1982). This established, the next question is: What is the source of the authority of the gate guards here, as "border" guards, to engage in their stops and seizures?

## I

The cases of this Court dealing specifically with a "border search" at the gate of a military installation overseas involved a policy or authorization of the *commander*. *See, e.g., United States v. Alleyne, supra* at 332 ("[b]ecause the installation commander has put out that all vehicles and persons and baggage that they carry, will be searched before exiting Camp Carroll ...."); *United States v. Rivera,* 4 MJ 215, 218 (CMA 1978) (though lead opinion does not make clear, Judge Cook, concurring in the result, relies upon authority of "the commander of" "a 'closed' American air base" "in a foreign country").

Mil.R.Evid. 314(c), Manual for Courts-Martial, United States, 1984, in providing for searches abroad, authorizes searches of persons and property "upon entry to or exit from the installation, enclave, aircraft, or vessel to ensure the security, military fitness, or good order and discipline of the command"—a rule that, surely, includes a border-search rationale. Yet that rule, by its own terms, depends upon the "author-iz[ation]" of "a *commander* of a United States military installation, enclave, or aircraft on foreign soil...." (Emphasis added.) Further, the Drafters' Analysis of both the original version of the rule and the 1984 amendment make clear that the rule is based on *Rivera* and *Alleyne*—cases which, as I just noted, involve authorizations of *commanders*. *See* Manual, *supra* at A22–21 and A22–24 (Change 2).

Moreover, no act of Congress, of which we have been made aware, expressly authorizes such "border" searches. *See generally* Mil.R.Evid. 314(b) ("Border searches for customs or immigration purposes may be conducted when authorized by Act of Congress."); Manual, *supra* at A22–24 (Change 2) ("Rule 314(b) recognizes that military personnel may perform border searches when authorized to do so by Congress."). It is possible, I suppose, to generally rely somehow on the language in the lead opinion of then-Chief Judge Fletcher in *United States v. Rivera, supra* at 217. There, he acknowledged the absence of ex-pressed congressional authority akin to the Act of July 31, 1789, c.5, 1 Stat. 29, 43, for "border searches" at the gates of a military installation overseas; yet, he believed "that the essential underlying rationale re-mains applicable, and that the factual similarities between an international border and the entrance onto an American military installation overseas compels [sic] adoption of the border search exception for this situation." 4 MJ at 217. It must be recalled, though, that Judge Cook's separate opinion in that case, 4 MJ at 218, as well as Mil. R.Evid. 314(c) which is based on Chief Judge Fletcher's opinion, suggested that *Rivera* did in fact involve a commander's authorization for the gate search.

I do not quarrel with applicability of the border-search concept to the gates of American military installations overseas. I merely submit, as Chief Judge Fletcher's *Rivera* opinion implies, that the *authority* to *conduct* border searches must emanate from a proper source. In the absence of congressional authorization addressing itself to security of the perimeter of United States military installations overseas, that source is the installation's commander: It is the *commander* who has the responsibility for the security of that installation and the authority—and obligation—to protect it in the name of the sovereign. *Cf. United States v. Kalscheuer,* 11 MJ 373, 376 (CMA 1981) ("By virtue of his command status, a commander has responsibilities that others do not possess, and so he must be granted powers commensurate with that responsibility."); *United States v. Jones,* 24 MJ 294, 295 (CMA 1987) (security officer "conducted a command-authorized gate search of vehicles entering the base" within the United States).

## II

The principal opinion makes repeated references to "the command policy" authorizing the procedure that Corporal Lee followed here. *See, e.g.,* 37 MJ at 123, 125, and 126. Notwithstanding, there is no evidence in the record that there was, at the time, a legally valid "command policy" that

authorized border-search-type operations at the gates of this installation. The several references during the testimony of various witnesses to the "policy" and to its source and scope *appear* to focus on the "policy" regarding the means of *conducting* the gate searches, rather than regarding *authorizing* them.

The military judge did take judicial notice, at trial counsel's request, of 2d Infantry Division Supplement to United States Forces Korea Regulation 190–7, part of which provided for gate-entry and -exit inspections. That supplement was promulgated "FOR THE COMMANDER" by the Chief of Staff and was authenticated as "OFFICIAL" by the Adjutant General. The difficulty is that, just prior to ruling on the defense motion to suppress, the military judge inquired whether that document "was still a valid supplement" in light of the fact that the regulation which it supplemented—US Forces Korea Regulation 190–7—had been superceded. Trial counsel ultimately advised the military judge that "we've determined that with the issuance of the new regulation, all supplements to the prior regulation are cancelled. Therefore, the 2d ID Supplement would not apply."

Until that point, defense counsel's various bases of objection did not include any challenge relating to whether the command had authorized the gate inspections. Indeed, defense counsel himself acknowledged the regulatory supplement at one point in his lengthy written defense motion to suppress. Even when it became quite clear on the record, however, that this supplement had lost its legal efficacy, defense counsel said nothing about that potential flaw. Under these circumstances, I believe that any objection to the seizure on the basis that the commander had not authorized a "border search" was waived. Mil. R.Evid. 311(d)(2)(A) and (3).

Moreover, there is good reason to hold counsel's feet to the fire here and, in the absence of a particularly based objection, to invoke waiver. For instance, as alluded to earlier, it is the commander's authorization that is critical, not how that authorization was manifested. In other words, the importance of the supplement is that it was *evidence* of the commander's authorization, not that it was somehow *itself* a prerequisite.

Thus, if defense counsel had challenged the existence of the commander's authorization once it became clear that the supplement had lost its legal vitality as evidence of that authorization, trial counsel might well have been able to prove the requisite authorization through a number of other means. As it stood, though, in the absence of such a defense challenge, trial counsel was not called upon to offer such evidence. Under these circumstances, waiver not only is a permissible conclusion, *see* Mil.R.Evid. 311(d); it makes good sense.